Jon EVERHART
and Joann Everhart,
*Plaintiff,*

*v.*

DEPARTMENT OF REVENUE,
*Defendant,*
*and*

WHEELER COUNTY ASSESSOR,
*Intervenor.*

(TC 4380)

Trial was held August 3, 1999, in the courtroom of the Wheeler County Courthouse, Fossil.

Douglas M. Adair, Assistant Attorney General, Department of Justice, Salem, argued the cause for Defendant (the department).

Thomas W. Cutsforth, Wheeler County Counsel, Fossil, argued the cause for Intervenor (the county).

Decision for Plaintiffs rendered November 17, 1999.

### CARL N. BYERS, Judge.

Plaintiffs (taxpayers) appeal the denial of special farm-use assessment for a 12.75-acre parcel in Wheeler County. Because the statutory Defendant, Department of Revenue (the department), agrees with taxpayers' position, the Wheeler County Assessor (the county) intervened and defended the appeal. Trial on the merits was held in Fossil.

### FACTS

The subject property is located on the John Day River in the Clarno area. The lower, southern half of the property has been subject to historic flooding from the river and has fairly good soil. Taxpayers have certified water rights entitling them to draw water from the river to irrigate 3.8 acres of that southern half. The upper, northern half of the property is Type VII soil or "wasteland," which produces minimal animal feed. The land is improved with a small house, a storage shed, an irrigation pump, and a pond. In addition to perimeter fencing, there are three cross fences and some other interior pen fencing.

Taxpayers purchased the property in January 1997 for $150,000. For 20 years prior to that, the property was owned by a Mrs. Freedle who used it to raise sheep. The property is zoned Exclusive Farm Use (EFU) and qualified for special farm-use assessment during Freedle's ownership.

There were no sheep on the property when taxpayers purchased it. On February 14, 1997, the county assessor sent taxpayers a letter indicating the property was being "scrutinized" for disqualification. The letter indicated that if taxpayers had evidence as to its farm use, then they should notify the assessor. Taxpayers went to the assessor's office and asked what was required to maintain special farm-use assessment. On May 10, 1997, taxpayers purchased five

"pair" of sheep, a "pair" being one ewe and a lamb, and placed them on the property. Taxpayers, who had 20 years of prior experience raising sheep in Clackamas County, personally cared for the sheep. Later in the same year, taxpayers sold the sheep through auction. On their federal income tax return Schedule F, taxpayers reported gross income of $414 and a net income of $389 from their farming activities.

## ISSUE

Does the subject property qualify for special farm-use assessment for the 1997-98 tax year?

## PRELIMINARY MATTER

At the beginning of trial, the department filed a Motion *in limine*. The motion asserted that the county was raising a new issue: the subject parcel was illegally created, and therefore it could not qualify for special farm-use assessment. The court denied the department's motion, and evidence was received on the issue. The evidence established that the assessor's records were in error and that county counsel had been misled as to the legal significance of certain information. One of the assessor's witnesses testified of a misunderstanding about whether the parcel had been combined with another. All of such evidence proved to be irrelevant because special farm-use assessment is not conditioned on legal partitions or conforming transfers. ORS 308.370 directs that "any" land within a farm-use zone exclusively used for farm use shall be specially assessed.

## ANALYSIS

Concerned that market forces often work against the preservation of farmland, the legislature has declared:

> "It is the legislative intent that bona fide [farm] properties shall be assessed at a value that is exclusive of values attributable to urban influences or speculative purchases." ORS 308.345(1).[1]

■ The legislature implemented that policy by providing for special assessment of land that is "used exclusively for farm use." The statutory picture of special assessment is not

---

[1] All references to the Oregon Revised Statutes are to 1995.

usually clear on first glance because of two features: (1) it utilizes a land use statute to define what is meant by "exclusively for farm use" and (2) it distinguishes land based on its zoning. Land that is zoned EFU is required to meet fewer requirements than land zoned for other purposes. Inasmuch as this case concerns land zoned EFU, the court need only address those requirements.

■　　　The relevant portion of ORS 308.370(1) provides:

"* * * Any land which is within a farm use zone * * * and which is used exclusively for farm use as defined in ORS 215.203(2), shall, for purposes of assessment, be valued at its value for farm use and not at the real market value it would have if applied to other than farm use."

■　　　To determine what constitutes "exclusively for farm use," the court must examine ORS 215.203(2).[2] That statute defines farm use as:

"* * * [T]he current employment of land for the *primary purpose of obtaining a profit in money* by raising, harvesting and selling crops or the feeding, breeding, management and sale of, or the produce of, livestock, poultry, fur-bearing animals or honeybees * * * or any other agricultural or horticultural use or animal husbandry or any combination thereof." (Emphasis added.)

That definition has three basic elements. First, that the land be currently employed. "Current employment" includes but is not limited to all of the uses listed in ORS 215.203(2)(b). The use of the word "current" refers to the present use of the land and suggests that the past or future use is largely irrelevant. The word "employment" suggests an active, purposeful, directed use of the land.

The second element of the definition indicates that the use of the land must be "for the primary purpose of obtaining a profit in money." That phrase looks to the intent

---

[2] The department has promulgated OAR 150-308.380-(A) to provide a "more detailed definition of farm use" for non-EFU land. However, the rule applies only to non-EFU land and is expressly for use by county assessors. Those limitations on the scope of the administrative rule reflect qualitative differences between EFU land and non-EFU land. Land in an EFU zone has no minimum income requirements and no past performance or past income requirements. Therefore, the rule is of no assistance in resolving the issue before the court.

of the user of the land. Inasmuch as intent is a subjective state of mind, it must be induced from objective observable conduct.

Third, the definition defines or describes the type of activities that qualify as "farming."

■ Farm use is not required to actually result in a money profit. Undoubtedly, the legislature recognized the risks of farming. It has not imposed any specific income requirements for land in an EFU zone.[3] It merely requires that the person engage in farm activities with the primary purpose of obtaining a profit. It is also clear that the legislature viewed bona fide farms as those farms that produced products or crops sold in the open market. Small operations such as raising chickens for family use or a few pigs to trade with a neighbor for some other product or service do not qualify.[4] The legislature's intent is to grant the special assessment to farmers who exchange their crops for "money."

One part of the definition in ORS 215.203(2) requires additional consideration by the court. That is: what constitutes a "profit" within the meaning of the statute? There is no statutory definition of the word and no administrative rule defines what constitutes a profit. Therefore, the court will look to the context in which the word is used. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 859 P2d 1143 (1993).

Two characteristics of the statutory scheme providing for special assessment provide evidence of legislative intent as to use of the word profit.

■ First, the legislature directed that only purchases by "prudent investors" for bona fide farm use may be considered in determining the value of farm land. *See* ORS 308.345(2). Those are purchases where the buyer has a reasonable expectation of earning an average annual return on capital of not less than the interest rate charged by the Federal Land Bank

---

[3] ORS 308.372 and ORS 308.407 do require land in a non-EFU zone to earn a minimum *gross* income in order to qualify for special farm-use assessment.

[4] The legislature has indicated that for non-EFU land, "gross income" includes crops or livestock used by the owner personally if accurate records of their value and use are kept. ORS 308.372(2)(a).

on first mortgages on farm properties. ORS 308.345(4). By excluding consideration of nonprudent sales, the legislature has demonstrated an intent not to consider the cost of capital or the return on capital in determining the possibility of a profit. Obviously, the more an individual pays for farm property, the less likely they could make a "profit" if profit meant earning a market rate of return on capital.

■　　Second, the owner of the property does not have to personally farm the property. A tenant farmer (whether a lessee, renter, sharecropper, or otherwise) may use the land and thereby qualify the land for special assessment. That would suggest that when the legislature used the word "profit," it intended to measure operating expenses against operating income.

Those characteristics are consistent with the common, usual, and ordinary meaning of the word "profit." That is, the term is ordinarily used to mean gain, or income greater than the expenses incurred in obtaining the income. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 611, 859 P2d 1143 (1993).

The above analysis suggests that the special assessment statutory scheme is counter intuitive by design. That is, it takes a narrow or limited view for purposes of determining qualification for special assessment. By looking only to the "current employment" of the land, the law ignores the past, and any intentions with regard to future use. Also, by looking to the "primary purpose" of using the land, the legislature recognizes that there may be other subordinate uses that are not profit motivated. Finally, the context in which the word profit is used indicates that the legislature was concerned with measurable direct expenditures and income from the use of the land. Indirect profits, such as savings on family food budgets, and indirect expenses, such as invested capital, are excluded from consideration.

In summary, it is clear that size is not determinative. To qualify for special farm-use assessment, the land does not have to be an "economically self-sufficient farm unit." *Rutherford v. Armstrong*, 31 Or App 1319, 1327, 572 P2d 1331, 1334 (1977). Similarly, ownership is irrelevant. *Ritch v. Department of Revenue*, 261 Or 78, 86, 493 P2d 38, 42

(1972). The fact that taxpayers here may have purchased the property for another reason such as land speculation or investment is irrelevant. In fact, one of the reasons for special assessment is to "defeat the effect" that "urban expansion" or "land speculation" can have on farmland. *Hulburt v. Dept. of Revenue*, 4 OTR 475, 479 (1971).

With the above understanding of the statutes, the court will now turn to the evidence in the case.

It is undisputed that the land in question is in an EFU zone. The evidence also established that the land was exclusively used to raise sheep. During the course of the trial, the county argued that the property was ideal for fishing and duck hunting. However, arguments are not evidence, and the county submitted no evidence of any other use than raising sheep. Therefore, the one remaining issue is whether taxpayers raised sheep primarily to make a profit in money.

The following evidence was offered to show that taxpayers' primary purpose for raising sheep was to obtain a profit in money: The past and present use of the subject land was to raise sheep. Taxpayers are sheep farmers of 20 years. The purchase price of the property at issue included a barn full of hay. That hay was subsequently fed to the sheep through 1997 and into 1998. The land is productive, particularly the lower portion due to the presence of the river and water rights. Taxpayers irrigated portions of their land, which enabled them to rotate sheep grazing areas. The department's expert testified that the nonirrigated areas of the property contain enough green forage to pasture the sheep as long as pasturing there is done on a less frequent basis. A fence running around the perimeter of the property with dividing fences running east to west enables taxpayers to do this. Each of the sheep was given appropriate inoculations, sheered, transported, and ultimately sold at auction. Although disputed, taxpayers claimed a $400 profit on the sheep for 1997.

The county offered little evidence to show that taxpayers' primary purpose for raising sheep was not to obtain a profit. For convenience, the court categorizes the county's arguments into three theses: (1) The land is incapable of supporting sheep; and, therefore, taxpayers are not raising the

sheep for profit; (2) The high prices paid for the property shows that taxpayers could not obtain a profit by raising sheep. Therefore, taxpayers' primary purpose for raising sheep could not be to obtain a profit; and (3) The sequence of events leading to taxpayers placing sheep on the property shows that their intent was primarily to avoid taxes. The court will address each argument in turn.

(1)   The land is incapable of supporting sheep.

The county asserts that taxpayers' land is incapable of supporting ten sheep for a profit, especially considering the lack of rainfall which the county receives. The department's expert testified that hay supplements and careful use of irrigated and nonirrigated portions of property make the land capable of supporting ten sheep for profit. That unrebutted testimony was persuasive.

(2)   Taxpayers paid too high a price for the property.

The county claims that the $150,000, which taxpayers paid for this land, grossly exceeds the price that someone intending to use the land to raise sheep for profit would pay. At that high price, it would be impossible to obtain a profit by raising sheep on the property.

However, as indicated above, it does not appear that "profit" was intended to consider or include return on capital. Even if it did, the price paid for property is not conclusive evidence of the intent of present acts performed thereon. It is possible to buy property at a high price intending to use it in the future for a nonfarm use, for example, recreational use. In the meantime, the owner may use the property exclusively for raising sheep. If the intent of such current use is to earn a profit in money, then the land would qualify for special assessment. The statute does not require that the primary purpose of *holding* the property be to obtain a profit. Instead, it requires the court to determine the primary purpose of the current farm activities performed on the land. For that reason, the court is not persuaded by the county's arguments with regards to the property's high price.

(3)   The sequence of events shows that the primary purpose of taxpayers' sheep raising was to avoid taxes.

The county asserts that the sequence of taxpayer's finding out about their ineligibility for farm assessment, followed by their procurement of sheep for the property, shows that taxpayers' primary purpose for raising sheep is to obtain lower property taxes.

Taxpayers took possession of the property in question in January 1997. The next month, the county sent taxpayers a letter indicating the property was being "scrutinized" for disqualification of farm-use assessment. Thereafter, in May, taxpayers purchased sheep and put them on the property.

That sequence of events does raise questions, but is not sufficient to overcome taxpayers' evidence. Taxpayers' underlying motivation for raising sheep may be to obtain special assessment. However, to obtain special assessment, taxpayers must be seeking a profit. Hence, the statutory requirement is not inconsistent with the intent to obtain special assessment.

The county points out that the dollar value of special farm-use assessment is significantly greater than the potential profit that may be reasonably expected from the property. That may be a sad fact of life for many farm parcels, particularly small parcels in non-EFU zones. However, there is no indication in the statutes that the legislature deems the amount of property tax savings a consideration. Given the risks of farming and the plight of many small farmers, the legislature may have concluded that protecting farm land is more important. Certainly, by not requiring *any* gross income from properties in an EFU zone, the legislature must have recognized that the savings in property taxes from special assessment may exceed any reasonable expectation of profit from a small parcel.

The evidence offered to support a conclusion that taxpayers did not have the requisite intent for profit does not outweigh the evidence offered on behalf of taxpayers. The court finds that the preponderance of evidence indicates that taxpayers primary purpose for raising sheep was to obtain a profit in money. Therefore, the court finds that the subject property, for the year in question, was used exclusively for

farm use as defined in ORS 215.203(2) and qualifies for special farm-use assessment.

In reaching the Decision below, the magistrate quoted *Beddoe v. Dept. of Rev.*, 8 OTR 186, 190-91 (1979) where the court stated:

"* * * The great boon of tax relief to the bona fide farmer through the special exemption for farm use is not to be extended to the professional man's fine residence in a filbert orchard, the city worker's five suburban acres and a cow, the retired person's 20 acres of marginal land on which a travel trailer constitutes the personal residence, unless the day-to-day activities on the subject land are principally and patently directed to achieving a profit in money through the farm use of the land."

That statement should not be misapplied or misinterpreted. The *Beddoe* case, and most all other cases where no farm use has been found, concerned non-EFU land. Even then, the quoted statement recognizes that the types of parcels described can qualify if there are day-to-day farming activities designed to achieve a profit. Consequently, small parcels can qualify if the requisite farming activities are conducted. In this case, the evidence indicated that day-to-day farming activities were conducted. Accordingly, judgment will be entered consistent with this finding. Taxpayers to recover costs.