IN THE OREGON TAX COURT
MAGISTRATE DIVISION

David L. WHITE
and Lori A. White,
*Plaintiffs,*

*v.*

HOOD RIVER COUNTY ASSESSOR,
*Defendant.*

(TC-MD 000923F)

David White, Plaintiff, argued the cause *pro se*.

Sandra Berry, Director, Department of Records and Assessment, Hood River County Assessor's Office, argued the cause for Defendant.

Decision for Defendant rendered January 18, 2001.

**SALLY L. KIMSEY, Magistrate.**

Plaintiffs appeal Defendant's disqualification of their land from farm use special assessment for the 2000-2001[1] tax year. The property is identified as Hood River County Assessor's Account Nos. 3514 and 12054.

Trial in the matter was held November 14, 2000, in Hood River. David White appeared for the Plaintiffs. Sandra Berry, Director, Department of Records and Assessment, appeared for Defendant. Lori White, Craig Danner, and Don Kiyokawa appeared as witnesses for Plaintiffs. Bill Byrne appeared as a witness for Defendant.

STATEMENT OF FACTS

The subject property is two parcels of land located in an exclusive farm use (EFU) zone. The parcels total 14.85 acres. The property contains Plaintiffs' home, an abandoned home, abandoned outbuildings, the remains of fruit trees, and numerous other items.

The subject property had been operated as an organic orchard for many years. It contained approximately 2,250 pear and apple trees. Prior to Plaintiffs' purchase of the property, the property had been owned and operated by Harry Inukai. During World War II, Inukai was interred at Tule Lake[2] in northern California. After the War, many merchants in the area would not sell to Japanese-Americans,

---

[1] Plaintiffs' Complaint addresses "tax year(s) 1999-2001." The subject property received farm use special assessment in tax year 1999-2000. Therefore, the Complaint is dismissed as to tax year 1999-2000.

[2] Tule Lake was one of a number of relocation centers operated by the War Relocation Authority during World War II. By Executive Order, all persons of Japanese descent were excluded from a particular area of the West Coast during the War. The evacuees, mostly United States citizens, were forcibly moved to the relocation centers. Tule Lake closed in March 1946. http://bartleby.com/65/re/relocati.html.

such as Inukai. Consequently, when he returned from Tule Lake, he traveled up and down the Interstate 5 corridor, buying things for resale to his neighbors. Over many years, Inukai purchased much more than he sold. When outbuildings became full, items were stored between the rows of the orchard. The outbuildings were neglected and began to deteriorate. The items inside the outbuildings were exposed to the weather. When his house became full, Inukai built a second house on the property. He moved into the second house and left everything inside the first house.

The orchard became seriously neglected. Plaintiffs purchased the property in 1994. Because of the state of the property, Plaintiffs could not obtain conventional financing. Plaintiffs lived in the basement of the new house while the Inukais lived upstairs. Inukai continued to manage the orchard. The last crop from the property was harvested in 1997. Plaintiffs' ability to remove unnecessary items was hampered by the fact that Inukai still lived on and managed the property. David White (White)[3] was able to remove some items and clean up around the new house.

After several years, Plaintiffs were able to obtain conventional financing. The Inukais received cash and bought a small house. The Inukais no longer had an ownership interest in the property.

In May 1998, Plaintiffs were notified that trees on their property "may be in violation of Hood River County Pest Control Amended Ordinance No. 149." Plaintiffs could not spray the orchard without losing the organic certification of the property. On June 2, 1998, Plaintiffs signed an agreement permitting "Hood River County's orchard pest control program * * * to carry out orchard pest control activities on the property[.]" Those activities included "entering [the] property with Hood River County heavy equipment and equipment operators, pushing over all unmanaged pear trees located on tax lot 200, [Account No. 3514] and exiting property in a timely manner." That process was started on June 2, 1998, and completed on June 4, 1998.

---

[3] David White is hereafter referred to as White for ease of reference. The court notes that David White performed the tasks described below.

Prior to the uprooting of the trees, Plaintiffs had intended to "continue with the existing organic orchard replacing failed, diseased trees over time." After the trees were uprooted, Plaintiffs undertook the massive project of preparing the land for replanting. In 1999, for example, White "cut, sectioned and burned over 1,250 mature pear and apple trees[.]" He also removed 250 root balls left in the ground and installed 1,000 feet of drain tile and drain.

Two actions undertaken by Plaintiffs in 1999 illustrate the extent of the deterioration of the property. White removed a 30 by 60 foot outbuilding. Removing the outbuilding necessitated removing and disposing of "14,400 cubic feet of farm trash and debris that had been accumulated by the previous owner." That is the equivalent of the entire building being full from wall to wall, eight feet high. White also removed an overgrown hedgerow. The hedgerow was 35 feet wide and 1,000 feet long.[4] In removing the hedgerow, White also removed a 1964 Mercury, numerous pieces of farm equipment, and approximately nine tons of other scrap metal "in the form of old lawn mowers, washing machines, pipe, bicycles, engines, motors, etc."

In 2000, Plaintiffs cut, sectioned, and burned more trees, removed more root balls and performed other land preparation work. White also established a one-acre holding area for livestock and "installed over 4,000 feet of high-tensile post [and] wire fencing around the perimeter of the farm's tillable [ten] acres." After completing the fencing, Plaintiffs purchased cattle, which grazed in the fenced area. The parties agree that grazing cattle is an acceptable farm use. The parties also agree that the expected long-term use of the property is as an orchard.

Craig Danner, a neighbor, testified on Plaintiffs' behalf. He testified that he has been watching Plaintiffs clean up the property and that between the trees are dozens of old vehicles. As White removes items from the property, he brings it down to the road. Every couple of months, White arranges for someone to haul away the scrap. Because the

---

[4] There was conflicting evidence on this point. One witness testified that the hedgerow was 1,500 feet long. Whether the hedgerow was 1,000 or 1,500 feet, a significant amount of tillable land was lost due to the wildly overgrown hedgerow.

hedgerow has been removed, the scrap on the property has been more visible which has resulted in some complaints about the property.

Don Kiyokawa also testified for the Plaintiffs. His family has been farming since the 1920s. He testified how to treat an orchard that is infested and must be replanted. When asked how he would do things differently if the property was in his control, he testified that he would do what Plaintiffs are doing "except [he] would hire it out."

Plaintiffs argue that the activities are farming in that all the activities are "directly related to improving the farm's infrastructure[.]" Plaintiffs are self-financing the improvements and performing almost all of the work themselves. Plaintiffs hire out work only when the work requires equipment that they do not own. Plaintiffs purchased numerous pieces of farm equipment to enable them to rehabilitate the farm. Plaintiffs submitted into evidence their personal income tax returns for 1997, 1998, and 1999. In each of the years submitted, Plaintiffs filed a Schedule F.[5] Schedule F is entitled "Profit or Loss From Farming." Plaintiffs expect to replant the orchard with chestnut trees in 2002. They expect their first crop three-to-five years after planting the trees.

The subject property first came to Defendant's attention in December 1998 when an appraiser from Defendant's staff noticed the uprooted trees. In April 1999, Bill Byrne visited the subject property. In May 1999, Defendant sent Plaintiffs a letter. The letter gave Plaintiffs 30 days to "show cause why the property should not be disqualified from farm use special assessment." White spoke to Berry who described acceptable farm uses as "crops in the ground or the raising and selling of animals or boarding of horses." White explained his plans. Defendant did not disqualify the property from farm use special assessment. Defendant, instead, chose to note the accounts for farm review in 2000.

Byrne visited the property for a second time in March 2000. Defendant again sent Plaintiffs a 30-day show

---

[5] In 1997, Plaintiffs reported farm expenses of $7,327. In 1998, Plaintiffs reported farm expenses of $6,309 and gross income of $2,970. In 1999, Plaintiffs reported farm expenses of $20,371.

cause letter. White again spoke to Berry describing his long-term plans for the property. Berry, although sympathetic to Plaintiffs' situation, determined that the land was not currently being used as a farm. Defendant disqualified the property from farm use special assessment in April 2000, effective July 1, 2000. Defendant does not disagree that Plaintiffs have performed the activities described above. Defendant argues, however, that the activities are not sufficient to qualify the land for farm use special assessment. Berry testified that while the farm is in what the parties agree is a temporary farm use of grazing cattle, Defendant would annually monitor Plaintiffs' use of the property. After Plaintiffs replant the orchard, Defendant expects to monitor the farm the same amount it monitors other orchards in the county.

## ANALYSIS

The Oregon Legislature created a special assessment program for property used for farm purposes. Property located within an EFU zone is entitled to special assessment if the property is being used exclusively for farm use. ORS 308A.062(1).[6] Farm use is defined at ORS 215.203(2)(a). The relevant portions of that statute provide:

> "As used in this section, 'farm use' means the current employment of land for the primary purpose of obtaining a profit in money by raising, harvesting and selling crops or the feeding, breeding, management and sale of, or the produce of, livestock, poultry, fur-bearing animals or honey-bees or for dairying and the sale of dairy products or any other agricultural or horticultural use or animal husbandry or any combination thereof. 'Farm use' includes the preparation, storage and disposal by marketing or otherwise of the products or by-products raised on such land for human or animal use. * * * 'Farm use' includes the on-site construction and maintenance of equipment and facilities used for the activities described in this subsection."

As this court found in *Everhart v. Dept. of Rev.*, 15 OTR 76, 79 (1999),

---

[6] Unless otherwise noted, all references to the Oregon Revised Statutes (ORS) are to 1999.

"[The] definition [of farm use] has three basic elements. First, that the land be currently employed. 'Current employment' includes but is not limited to all of the uses listed in ORS 215.203(2)(b). **The use of the word 'current' refers to the present use of the land and suggests that the past or future use is largely irrelevant.** The word 'employment' suggests an active, purposeful, directed use of the land."

(Emphasis added.)

The situation of Plaintiffs is similar to the situation faced by the plaintiffs in *Shephard v. Dept. of Rev.*, 8 OTR 122 (1979). In *Shephard*, the plaintiffs' farm was infested with tansy ragwort. Tansy ragwort can be fatal to livestock. Working with their county extension agent, plaintiffs in that case started a program to rid their property of tansy ragwort by using cinnabar moth caterpillars. They had to remove the cattle that had been grazing on the property. The Clackamas County Assessor disqualified the property from special farm use assessment because no livestock was on the property. The court held that,

"The purpose of placing the cinnabar moth on the subject property was to attempt to control the tansy ragwort, and not to employ the land currently 'for the purpose of obtaining a profit in money.' ORS 215.203(2)(a). Although it can be argued that Plaintiffs' laudable efforts may restore the subject property to profitable *future* activities, the statutory language requires *current* use for profits, with certain explicit statutory exceptions. * * * [P]laintiffs' use of the subject property does not fall within any of the categories listed in ORS 215.203(2)(b). Plaintiffs' problem is one never contemplated by the drafters of the statute. Following the rule that statutory exemptions * * * are to be strictly construed, the court has no power to order relief for the Plaintiffs under the facts of this case."

*Id.* at 126 (emphasis in original).

Similarly, the purpose of uprooting the trees in the present case was to rid the property of the pest infestation. Once the trees had been uprooted, there was no crop in the ground and the land was not being "currently employ[ed] for the primary purpose of obtaining a profit in money" until Plaintiffs started grazing cattle on the property. ORS

215.203(2)(a). As in *Shephard*, Plaintiffs' act of uprooting the trees[7] and their extensive efforts to clean up and remove the scrap from the property are attempts to "restore the subject property to profitable *future* activities." *Id.* at 126 (emphasis in original).

■       Plaintiffs' additional tax liability is, at this point, deferred. ORS 308A.706(1)(a) states that:

"(1)   Notwithstanding that land may have been disqualified from special assessment, the additional taxes described under ORS 308A.703 **shall not be imposed and shall remain a potential tax liability** if, as of the date the disqualification is taken into account on the assessment and tax roll, the land is any of the following:

"(a)   Disqualified exclusive farm use zone farmland or nonexclusive farm use zone farmland that:

"(A)   Is not being used as farmland; and

"(B)   **Is not being used for** industrial, commercial, residential or other **use that is incompatible with a purpose to return the land to farm use.**"

(Emphasis added.)

At the time of the subject property's disqualification, Plaintiffs were preparing the land for future farm use and clearly qualified for the deferral. The "potential tax liability" described above only becomes an actual tax liability if the use of the subject property changes "to an industrial, commercial, residential or other use incompatible with a return of the land to farm use[.]" ORS 308A.712(2).

## CONCLUSION

Plaintiffs are sincere, hardworking people who are improving their property so that it may be returned to productive farm use. They have spent many, many hours and a significant amount of money in their efforts. Plaintiffs' efforts are commendable. Unfortunately, the statutory scheme does not provide an exception for Plaintiffs' situation. It is beyond the power of the court to create such an exception.

IT IS THE DECISION OF THE COURT that Plaintiffs' appeal is dismissed as to tax year 1999-2000.

---

[7] Plaintiffs acted through Hood River County's orchard pest control program.

IT IS THE FURTHER DECIDED that Plaintiffs' appeal as to tax year 2000-2001 is denied.