Scott C. YOUNG, M.D.
and Robin A. James,
*Plaintiffs,*

*v.*

JACKSON COUNTY ASSESSOR,
*Defendant.*

(TC-MD 011076A)

Trial was held April 18, 2002, in the U.S. District Court in Medford.

Christian E. Hearn, Davis, Gilstrap, Hearn, Saladoff and Smith, P.C., Ashland, argued the cause for Plaintiffs (taxpayers).

Ed Good, Data Analyst, Jackson County Assessor's Office, argued the cause for Defendant (the county).

Decision for Plaintiffs was rendered August 9, 2002.

**SCOT A. SIDERAS, Magistrate.**

Plaintiffs have appealed Defendant's act of disqualifying their property[1] from special assessment as lands in farm use for the 2001-02 tax year. Plaintiffs' counsel was Christian E. Hearn. Their witnesses included Norman Foeller, a consulting forester; Geoffry Dawson, a contractor of off grid electric systems; Patie Milan, a realtor; John Buma, a retired dairy farmer; Lonnie White and Matt Buma, respectively Plaintiffs' former and current ranch managers; Ed Bemis, a general contractor; and Doug Mason and John Jacob, both professional beekeepers. Ed Good, of the assessor's staff, represented Jackson County. David Nelson, also of the assessor's staff, was his witness.

The question posed by this appeal is whether grazing honeybees, as opposed to grazing cows, is a farm use of the land sufficient to qualify it for special assessment in an exclusive farm use zone. The applicable statutory framework is ORS chapter 308A.[2]

## I. STATEMENT OF FACTS

This property consists of some 1,689.47 acres in Jackson County, approximately three miles to the north of Ashland and some five miles east of Talent, between Myer Creek to the west and Butler Creek to the east, on the northeast side of the Bear Creek drainage. Its terrain slopes from 10 to 50 percent as its elevation ranges from 2,640 to 3,960 feet. The distinctive topographic features are cliffs and rocky soils. Vegetation types include areas of meadow (782 acres),

---

[1] The specific accounts include:

| | | |
|---|---|---|
| 381E09-200; | 1-089830-6 | 4 acres |
| 381E09-200; | 1-004495-1 | 178.07 acres |
| 381E15-200; | 1-009609-6 | 440 acres |
| 381E16-100; | 1-012284-1 | 160 acres |
| 381E16-200; | 1-012285-8 | 299.20 acres |
| 381E16-300; | 1-012287-4 | 3.9 acres |
| 381E16-302; | 1-012289-1 | 3.3 acres |
| 381E22-200; | 1-009611-0 | 600 acres |
| 381E27-200; | 1-009619-3 | 79 acres |

[2] All references to the Oregon Revised Statutes (ORS) are to 2001.

hardwood and brush (509 acres), conifer and hardwood (103 acres), and wetlands and streams (147 acres). With this topography and absence of irrigation,[3] and, as much of its soil is of numbers 27D and higher, the property is not productive farmland. It is zoned for exclusive farm use, with a habitat overlay for Roosevelt elk and blacktail deer.

Historically it has been used for grazing livestock. This was the basis for its previous assessment as lands in farm use. However, the depressed livestock market led to limited returns, which, especially when considered in light of the damage to the land from grazing, caused the decision to find alternate agricultural uses of the property. The last year cattle grazed on the land was in 1999. The next growing season was spent repairing fences and allowing the land to lie fallow to rejuvenate the natural wildflowers and other flora.

Plaintiffs have a professional farm manager. There is a large, newly constructed barn and shop with some $300,000 invested in farm machinery, equipment, and a licensed vehicle. There is an Oregon Stewardship Plan for the subject property. Although Plaintiffs' thoughts about the property have been as diverse as raising horses to raising koi, their actual activities on the land have consisted of planting trees, cultivating lavender, setting out an organic garden, and beekeeping.

Some 1,250 Ponderosa pine and Douglas fir were planted to assess the land's potential to raise Christmas trees or marketable timber. Despite careful selection of the planting sites, protection from browsing wildlife by mesh tubing, and hand watering, dry soils and dry weather led to a low survival rate. Approximately 4,000 lavender plants are growing on less than an acre, but the immature plants, while established, have yet to reach a commercial stage. Organic gardening was carried out on some two acres with disappointing results.

The most successful use of the property has been to' raise bees, which began in February 2001. Plaintiffs have a professional beekeeper who operates the property's three apiaries, which are set approximately two miles apart. Those

---

[3] The streams dry up during the summer.

apiaries each consist of 50 colonies of bees, surrounded by a double layer of fence, part of which is electrically charged by solar power to discourage bears. The apiaries, located to the north, center, and south of the property, each occupy less than an acre.

The bees fly from the apiary to search for pollen and nectar. Sources include wildflowers, which have become abundant since the removal of the cattle. Expert testimony opined, buttressed by texts and journals, that honeybees will forage distances of two-to-six miles, or more, from their hive. The experts also identified the subject property as good land for keeping bees, with its abundant blooms of wildflowers and vetch followed by star thistles, and that three apiaries were an adequate load for the land, especially during a dry year.

Income from raising bees comes from three sources. Plaintiffs' bees, like most other Oregon bees, were leased to California almond growers during the flowering season for the pollination of that crop. Honey, of which a colony will produce some 150 to 200 pounds, is an obvious product. Other commodities produced by bees include pollen; propolis, a plant resin gathered by bees; wax; and royal jelly. Bees themselves are also sold. It was opined that the subject property might generate as much as $10,000 from honey production; total gross income from beekeeping could be as high as $37,000 at the wholesale level, with a correspondingly greater return if sold at the retail level.

Expert testimony, from both master beekeepers and experienced livestockmen, was given that bees and cattle both cannot forage off the same land. Cattle eat the wildflowers, vetch, milkweed, and clover that bees use for pollen and nectar before the plants bloom. Star thistle, while extremely valuable to bees as the only source of pollen during the late summer, is categorized as a noxious weed as to cattle.

## II.  ANALYSIS

Was the Plaintiffs' beekeeping a sufficiently intensive use of their land to qualify for its assessment as lands in farm use? It is immediately apparent that, if it is not, Plaintiffs may not qualify for the special assessment. Plaintiffs'

plans to board horses on the property, or to breed koi, are insufficient. Preparatory activities are never enough to qualify as a **current** farm use of the land. ORS 308A.056(1). The planting of Douglas fir and Ponderosa pine seedlings does not qualify the property. The trees were neither planted pursuant to an approved plan that would enable the land to qualify as forestland under an alternative program for special assessment under ORS chapter 321, nor, by virtue of the terrain and soils of the subject property, were they grown on lands capable of preparation by intensive cultivation methods as set out in ORS 308A.056(4)(b)(A). As for the lavender and organic garden, those plantings, done on less than five acres, are not enough to carry the assessment of the property as a whole.

With this focus, can bees foraging upon blooms replace cows grazing upon grasses as a qualifying farm use of this 1,700 acre ranch? The conclusion of the court is that they did. The reasoning behind that conclusion is as follows:

A.   *Honeybees are a qualifying farm use of the property.*

■      Honeybees are specifically set out in ORS 308A.056(1)(b) as a means by which a farmer may currently employ the land for the primary purpose of making a profit in money.

B.   *The honeybees make a sufficiently intensive use of the entire property.*

Undisputed expert testimony, from two professional beekeepers, demonstrated that the apiaries on the subject property, each with 50 colonies of bees, were foraging for pollen and nectar across the entire property. It is also undisputed, on this record, that the subject property, with its wildflowers, clover, and vetch in the spring, and star thistle in the summer, is eminently suited for keeping bees. That is enough to make the land currently employed in a farm use for purposes of ORS 308A.056(1).

■      Defendant has stated that, although it would be willing to recognize the land under the apiaries as a qualifying farm use, it was unwilling to extend that benefit to the land the bees foraged upon. The court disagrees with that narrow

view because of the expert testimony as to the incompatibility of the alternate uses of this property. This is not particularly productive farmland. No one, expert or otherwise, has suggested any alternate use for the property other than for either raising livestock or beekeeping, and undisputed expert testimony has established that beekeeping is incompatible with raising cattle. Both creatures forage on the same plants. Cows, eating the vegetation before it blooms, preclude the bees' ability to gather pollen and nectar. With marginal property of this character, the court finds that the bees use not only the land under the apiaries, but also the balance of the property.

C. *As to this particular piece of land, beekeeping is an "[a]ccepted farming practice" as that phrase is used in ORS 308A.056(4)(a).*

Defendant, pointing to the fact that beekeeping produced only some $4,000 in gross revenue in 2001, and under Plaintiffs' projections would, under typical conditions, produce less than $40,000 in total gross revenue, questions whether such a minimal return is enough relative to the benefit of special assessment. That argument, however, is precluded by the thrust of the special assessment statutes.

The whole point of the farm use assessment statutes is the recognition that farming generates comparatively small returns relative to the value of land that the market recognizes alternative uses for. ORS 308A.050. It is for that reason that the state has decided to extend special protections to farming, despite the limited returns it often generates. *Everhart v. Dept. of Rev.*, 15 OTR 76 (1999). Farm use is not required to actually result in a profit. *Everhart*, 15 OTR 76, 80. However, while Defendant's balancing of the economic returns of farming relative to the benefit of special assessment are precluded by statute, a consideration of potential profits is especially important in another respect.

Would a farmer, choosing among alternative uses of his or her land and using as a test the profits he or she might make, decide that beekeeping was a sound choice? As Defendant observed, it was aware of no other "bee ranches" in this state. Are Plaintiffs, in choosing to run bees to the exclusion

of cattle on their land, using their property according to "[a]ccepted farming practice" as set out in ORS 308A.056(4)(a), that is, in a "mode of operation that is common to farms of a similar nature, necessary for the operation of these similar farms to obtain a profit in money and customarily utilized in conjunction with farm use"?

The conclusion of the court is that, in this instance, they were. First, no less than two expert beekeepers testified that the subject property was well suited to beekeeping, and that Plaintiffs' honeybees were professionally managed. Next, while the level of evidence on that point was not as strong as other proofs in this case, Defendant did not rebut Plaintiffs' testimony that raising cattle, due to the price offered for beef relative to their total expenses, including damage to the land, is not an attractive option. The court finds it reasonable that a farmer or rancher, balancing the costs and benefits of raising cattle, might choose beekeeping as an alternative.

Although the returns from beekeeping are modest, they are positive, and set off by a comparatively small outlay of expenses. The only fences a beekeeper needs to keep up are the electrically charged ones about the apiary to keep the bears away from the honey. If the beekeeper is especially ambitious, he or she might broadcast wildflower seed. Applying medicines to a colony of bees is less expensive than doing the equivalent to a herd of cattle. Plaintiffs were able to transport more than half a million bees to California to provide pollination services using a single truck. Taking a herd of cattle to market is a larger undertaking. On this state of the record, the court does not disagree with Plaintiffs' choice to pasture bees rather than cows, and finds their use of the land was consistent with accepted farming practice under ORS chapter 308A.

Additional factors deserve emphasis. First, this property is located within an exclusive farm use zone. As the court remarked in *Everhart*, a different perspective should be applied to zoned, as opposed to unzoned, farmland. Land that is zoned exclusively for farm use is "required to meet fewer requirements than land zoned for other purposes." *Everhart*, 15 OTR 76 at 79. Second, the level of expert testimony in this

case is remarkable. Plaintiffs supplemented their own testimony with, among others, that of two professional beekeepers, a dairyman, two professional ranch managers, and a forester. Third, Plaintiffs' pursuit of farm activities was by no means casual. They had retained a farm manager, were operating according to a stewardship plan, and had invested substantial sums in equipment. Those points are indicative of the conclusion that, while Plaintiffs are in the process of constructing a fine residence on their land, the day-to-day activities on the balance of their almost 1,700 acres are "principally and patently directed to achieving a profit in money through the farm use of the land." *Beddoe v. Dept. of Rev.*, 8 OTR 186, 191 (1979).

With those points the analysis is now complete. Cattle were last on the land during 1999. During 2000 the land lay fallow to recover from grazing, which as a normal and regular requirement of good animal husbandry is permitted under ORS 308A.056(3)(b). In 2001 Plaintiffs began their beekeeping. The court finds that that beekeeping was a current employment of the entire property, according to accepted farming practices, for the primary purpose of obtaining a profit in money.

Defendant's presentation of authorities do not disturb that conclusion. Unlike the Opinion and Order of the Department of Revenue in *In the Matter of the Appeal of Kevin J. Freeman*, No. VL 81-126 (Feb 27, 1981), this is not a matter in which preparatory activities were the only action as to the property, but instead a situation where honeybees were producing an income to Plaintiffs. Although tansy ragwort may be a noxious weed and so indicative of an absence of farm use in *Shepherd v. Dept. of Rev.*, 8 OTR 122 (1979), here the star thistle, while noxious to cattle, is prized by the beekeeper and one of the factors that make this property so suitable for Plaintiffs' operations. Too long a break in farm use is incompatible with special assessment, as demonstrated by *Topnotch Orchard v. Jackson County*, TC-MD No 011010D (Mar 20, 2002), however here the break did not exceed the planned interval of one year permitted by ORS 308A.056(3)(b). An absence of farm use is inconsistent with the special assessment, as in *Taylor v. Dept. of Rev.*, 6 OTR 496 (1976), *Ameral v. Dept. of Rev.*, 14 OTR 56 (1996), and

*Baker v. Jackson County*, TC-MD No 000978F (July 6, 2001), however, the court has concluded that an absence of farm use is not the situation as to the subject property. And as the court previously noted in its mention of *Everhart*, 15 OTR at 76, cases construing unzoned farmland, such as *Capsy v. Dept. of Rev.*, 9 OTR 162 (1982) are not the best precedent for exclusive farm use properties.

On these facts and reasoning, Plaintiffs' property qualifies for special assessment as lands in farm use.

### III. CONCLUSION

Now, therefore,

IT IS THE DECISION OF THIS COURT that this appeal is granted.[4]

---

[4] Plaintiffs requested at trial that the court's remedy reach the 2002-03 tax year. The court does not have a prospective reach.