IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Income Tax

| | | |
|---|---|---|
| HOUSTON VINEYARDS, INC., | ) | |
| STEVE HOUSTON, and DORIS ROBERTS, | ) | |
| | ) | |
| Plaintiffs, | ) | TC-MD 220486G |
| | ) | |
| v. | ) | |
| | ) | |
| DEPARTMENT OF REVENUE, | ) | |
| State of Oregon, | ) | |
| | ) | |
| Defendant. | ) | **DECISION** |

This case concerns whether or not a vineyard was operated for profit for purposes of deducting expenses under either section 162 or section 183 of the Internal Revenue Code (IRC). The tax years at issue are 2018 through 2021. At trial, Plaintiffs were represented by Kent Anderson, attorney-at-law, and Defendant was represented by Daniel Paul and Belle Na, assistant attorneys general. Plaintiffs Steve Houston and Doris Roberts testified on their own behalf. Also testifying for Plaintiffs were: Robert Buchholtz, their tax preparer; Nicholas Coats, their commercial insurance agent; Michael O'Connell, Jr., a residential real estate broker; and James Evonuk, a neighboring farmer. Testifying for Defendant was its auditor, John Post. Plaintiffs' Exhibits 1 to 9 and Defendant's Exhibits A to K, M, N, Q, U, V, and X were admitted.

I. STATEMENT OF FACTS

Houston Vineyards, Inc. is an S-corporation owned entirely by Mr. Houston. (Def's Ex H at 109.) Through it, Mr. Houston operates a vineyard on twenty acres of exclusive-farm-use (EFU) zoned land, located on a river about three miles outside of Eugene. The jointly owned residence of Mr. Houston and Ms. Roberts ("the main house") is situated on that land. Other improvements include a rental home, a barn, and a winery building.

Mr. Houston comes from a family of grape growers in Lodi, California. As a teenager, Mr. Houston leased and farmed his grandparents' vineyard. At college, he studied sciences relevant to farming, and he holds a degree in agricultural economics. His testimony demonstrated knowledge and familiarity with the science of grape farming, from selecting land and grapes, to protecting and tending vines.

Mr. Houston bought the land on which his house and vineyard are now sited for $92,500 in 1980, and he planted the first five acres in 1981. The parcel was low, flat land, like the land used for vineyards in Lodi. He planted Chardonnay grapes because they grow better in cooler climates, and chose a particular clone—Davis #5—for its pest resistance and reputation as a reliable producing vine. As it turned out, flat land is suboptimal for vineyards in Oregon because it traps cool air and delays the ripening of the grapes. Furthermore, researchers have since recognized that the Davis #5 clone does not produce a good yield in Oregon's climate.

Little data is available about the first 30 years that Mr. Houston farmed those five acres. He performed most of the work personally, and retired from a railroad job in the 1990s to dedicate his time to the vineyard. He installed specialized irrigation systems to mitigate the danger from frost during the cool seasons, and he constructed a building for use as a winery, although it appears that winery never developed the capacity to process all the grapes he grew.

In 2005, Mr. Houston signed a 10-year contract to sell his grapes exclusively to what was then the largest winery in Oregon. With that winery's assistance, he expanded his vineyard to 20 acres. The winery advanced the labor associated with the expansion, which Mr. Houston repaid from grape sales over the term of the contract. He testified that he received only 30 percent of the value of his crop during that period, but considered the additional acreage worth it.

/ / /

Ms. Roberts testified that she has been making loans to Mr. Houston to cover vineyard expenses since 2004. The money came from her wages as a nurse, from investments, and from an annuity constituting part of a structured personal injury settlement. Ms. Roberts had not tallied up the amount of those loans at the time of trial, but testified they are to be repaid when the vineyard begins making a profit. Ms. Roberts also financed the construction of the main house—completed in 2011—which she considers an investment that will make the property more attractive to California buyers.

Mr. Houston ran the vineyard without a written business plan, explaining that his method was to react to fluctuations in market conditions, the weather, and input costs.[1] He testified that he did not set a budget because income and expenses varied greatly from year to year. He kept a record of expenses for taxes, but did not otherwise track the vineyard's losses.

Plaintiffs provided the following business records from the years at issue: a $30 receipt dated August 2018 for an online classified advertisement (Ptfs' Ex 1); an email to Mr. Houston from a buyer dated November 2020, stating crush tag amounts totaling 56.978 tons (Ptfs' Ex 4 at 1); a spreadsheet of unknown origin showing 2021 pick dates and amounts totaling 93.035 tons (Ptfs' Ex 4 at 2); licenses and tax reports dated in 2018, 2019, 2020, and 2021, showing amounts of grapes and wine sold (Ptfs' Ex 6); various licenses and permits (Ptfs' Exs 6 at 1; 7 at 3, 5, 8); a 1099-MISC showing $23,200 in rents paid to "SM Houston" in 2021 (Ptfs' Ex 9 at 2); and a 1099-NEC showing $75,247.75 in nonemployee compensation paid to "CJL Fisherman Agricola" in 2021 (Ptfs' Ex 9 at 3).

/ / /

---

[1] An email to Plaintiffs' former attorney, dated October 2021, summarizes Mr. Houston's activities from 1980 to 2021 in a series of "5 year business plans." (Ptfs' Ex 5.) Mr. Houston testified that he prepared that document for the audit.

In addition, Plaintiffs provided an email from the grape buyer dated April 2023 that includes a Quickbooks report of bill payments to Houston Vineyard: $26,078.98 in December 2020; $26,791.20 in March 2021; and $91,872.06 in December 2021. (Ptfs' Ex 4 at 3.)

The fullest record of the vineyard's economics is drawn from tax returns dating back to 2010, but Mr. Buchholtz—who prepared the returns—testified they contain errors. (Def's Exs G at 1, H.) The returns report income and expenses generating ordinary losses averaging over $100,000 per year between 2010 and 2021. Mr. Buchholtz testified that the returns for 2010 to 2014 understated income because they did not account for the repayment of the loan to the winery from grape sales, and that expenses for all years were overstated due to the inclusion of obligations to Mr. Houston for interest, rent, and labor that were never paid.[2] He estimates that the vineyard's true losses were from $40,000 to $23,000 less per year than was stated on the returns.

Mr. Houston described the vineyard's poor performance as due to a combination of weather events, market oversupply, and his own serious health problems beginning in 2018. However, he testified that he still expected to make a profit from the appreciation in the vineyard's value.

Mr. Coats, Plaintiffs' insurance agent, and Mr. O'Connell, a real estate broker, testified to the value of the improvements Plaintiffs made on the land. Mr. O'Connell testified that the property was "very marketable," with its location close to Eugene being "the important part." River access and the main house's style and type also added value. He emphasized that the property's EFU zoning allowed a dwelling only in conjunction with farming. Mr. Coats testified

---

[2] Mr. Buchholtz testified that the errors did not significantly affect Mr. Houston's tax because the unpaid obligations were also reported as income on Mr. Houston's personal return.

that the improvements were insured for replacement costs totaling $3.37 million, of which $2.14 million was for the main house and the remainder for the rental home, barn, wellhouses, and winery building.

## II. ANALYSIS

At issue is whether Mr. Houston operated his vineyard with an intent to make a profit. The question matters because Plaintiffs' farming deductions exceeded their farming income during the years at issue, thereby reducing their taxable income from other sources. That tax benefit is allowable under section 162 of the Internal Revenue Code (IRC) if the farming is a for-profit business, but otherwise Plaintiffs may only deduct farming expenses up to the amount of their farming income. *See* IRC § 183(b)(2). Plaintiffs must bear the burden of proof. *See* ORS 305.427.[3]

Although this is a state tax matter, the federal Internal Revenue Code applies because Oregon cross-references it in its statutory definition of taxable income, subject to modifications not pertinent here. *See* ORS 316.022(6). In addition, Defendant is bound to "apply and follow the administrative and judicial interpretations of the federal income tax law" insofar as is practicable. ORS 316.032(2).

Business expenses are deductible under IRC section 162. "[T]o be in engaged in a trade or business, the taxpayer must be involved in the activity with continuity and regularity and * * * the taxpayer's primary purpose for engaging in the activity must be for income or profit." *Commissioner v. Groetzinger*, 480 US 23, 35, 107 S Ct 980, 94 L Ed 2d 25 (1987), *cited by Kirwan v. Dept. of Rev.*, 21 OTR 424, 429 (2014). Ordinary and necessary business expenses are

/ / /

---

[3] The court's references to the Oregon Revised Statutes (ORS) are to 2023.

deductible to the extent they are "paid or incurred," and are not limited to the amount of the business's revenue. *See* IRC § 162(a).

Expenses of an activity "not engaged in for profit" are deductible under IRC section 183. They may be deducted just as the expenses of for-profit activities, but are capped at the gross income derived from the activity (minus any deductions allowed regardless of profit motive). IRC § 183(b)(2).

Where a taxpayer's profit-seeking purpose has been challenged, a careful examination of the facts and circumstances of the activity is needed. For an activity to avoid coming under section 183, "the facts and circumstances must indicate that the taxpayer entered into the activity, or continued the activity, with the objective of making a profit." Treas Reg § 1.183–2(a). The federal Treasury regulation lists nine factors, distilled from court cases, that are "relevant" to whether an activity is engaged in for profit.[4] Treas Reg § 1.183–2(b). The factors are not meant to be exclusive or to be tallied up mathematically; they are potentially indicative types of evidence. *See id.*

In evaluating Mr. Houston's objective in operating the vineyard, the court's focus is on the years at issue. He has farmed that land for over 40 years, and his purpose in 1980 may differ from his purpose in the years at issue. What is important is why he "continued the activity" of farming from 2018 to 2021. *See* Treas Reg § 1.183–2(a).

` Reviewing the evidence presented in this case, the vineyard's unbroken record of losses stands out. The reported losses are quite large, averaging over $100,000 per year from 2010 to

---

[4] The factors are: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the taxpayer's success in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the taxpayer's financial status; and (9) any elements of personal pleasure or recreation in the activity.

2021, and show no discernable pattern of improvement: Plaintiffs' reported losses for the the years at issue were $99,281 (2018); $123,515 (2019); $116,831 (2020); and $115,354 (2021). Even accepting Mr. Buchholtz's testimony that the annual real losses were $40,000 to $23,000 less than reported, the expenses are more than double the vineyard's gross revenue from grape sales in 2020 and 2021, the only two years for which that information is available. Sustained losses in that proportion to gross revenue would present a severe test for a profit-seeking business.

Despite the ongoing losses, little effort appears to have been made to systematically measure the vineyard's performance. Apart from what Plaintiffs reported for tax purposes, the only records of grape production are found in emails from the grapes' buyer. The amounts of only two years' grape sales revenue are recorded, and that is in an email solicited from the buyer during the audit. No contemporary written record of the time spent and and work performed in the vineyard was presented, suggesting that Mr. Houston did not closely track that information. Mr. Houston's casual approach to recordkeeping, in conjunction with the large annual losses, suggests that profit was not foremost among Mr. Houston's purposes in operating the vineyard.

It is possible to run a business at a loss while expecting to ultimately profit from the sale of the business assets, and Mr. Houston testified that was his expectation. He testified that the vineyard was a retirement investment and that its expected sale price made expanding it to 20 acres "pencil out" despite losses in the short term. Although his total reported losses since 2010 amount to over $1.5 million, the improvements on the vineyard property are currently insured for $3.37 million.

Where profit is expected through the increase of a farm's property value, the question arises whether the profit-seeking activity is farming or is instead land speculation. *Davis v. Dept.*

*of Rev.*, TC–MD 190099G, 2020 WL 1699543 at \*4 (Or Tax M Div Apr 8, 2020). Land speculation of farmland typically occurs where the land value is increasing due to factors other than the farming, such as urban expansion. *See id.;* William K. Waugh III, *The Effect of Unrealized Appreciation in Determining Profit Motive in Farming Enterprises*, 16 U Kan L Rev 529, 535 (1968). "Where land is purchased or held primarily with the intent to profit from increase in its value,"—that is, from a value increase due to factors other than farming—"and the taxpayer also engages in farming on such land, the farming and the holding of the land will ordinarily be considered a single activity only if the farming activity reduces the net cost of carrying the land for its appreciation in value." Treas Reg § 1.183–1(d)(a). An intention to profit from farming can include land appreciation where the farming itself causes the increase in land value. *Davis*, 2020 WL 1699543 at \*4 (finding farming activity included profit expectation from restoration of derelict ranch in remote rural location).

The extremely limited value evidence available indicates that most of the property's value ($2.14 million out of $3.37 million) lies in the main house, rather than in the vineyard.[5] Furthermore, testimony from Plaintiffs' broker indicated that the property's marketability was largely due to its excellent location near Eugene. Those facts suggest that the property's primary value on the market is as a dwelling and that its market value has increased because of its proximity to Oregon's second-largest city rather than because of the farming done on the land.

Plaintiffs assert the property's EFU zoning merges the holding of land and farming because it renders the property's residential and agricultural uses interdependent, but do not explain further. In fact, EFU status reveals nothing about the purpose for which a property was

---

[5] No implication should be drawn that an insured value is equivalent to market value; it is merely the only evidence of value presented in this case.

bought or held—the question is "irrelevant" to the special assessment statutes. *Everhart v. Dept. of Rev.*, 15 OTR 76, 82 (1999) (acknowledging "fact that taxpayers here may have purchased the property for another reason such as land speculation or investment" while holding that their separate farming activity sufficed for special assessment).

Considering the above, the court finds that Plaintiffs' farming and holding the land are two distinct activities. Therefore, any appreciation in the land's value cannot be weighed against the farming losses. *See* Treas Reg § 1.183–1(d).

The court does not doubt Mr. Houston's expertise and effort in pursuing viticulture. It would be entirely unsurprising to find that profit-seeking was his primary purpose during the first 30 years of operation, although the evidence before the court does not establish that. Nevertheless, since the main house was built in 2011, the vineyard was operated without even rudimentary recordkeeping while the farm's expenses dwarfed its revenues. The evidence presented at trial does not establish that Plaintiffs' intended to profit from farming rather than from the increasing value of their home.

## III. CONCLUSION

Because the evidence does not show that the vineyard was operated for profit, Plaintiffs' deductions for farming expenses are limited to those allowed under IRC section 183. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiffs' appeal of Defendant's assessments for tax years 2018, 2019, 2020, and 2021 be denied.

_____

*If you want to appeal this Decision, file a complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within <u>60</u> days after the date of this Decision or this Decision cannot be changed.  TCR-MD 19 B.*

*This Decision was signed by Magistrate Poul F. Lundgren and entered on March 24, 2025.*