DECISION
Plaintiffs appeal Defendant's disqualification of their property identified as Accounts R63212 and R63213 from farm use special assessment. A trial was held in the Oregon Tax Courtroom, Salem, Oregon, on Monday, January 12, 2009. David Dahl (Plaintiff) appeared on behalf of Plaintiffs. Glen White, Lead Appraiser, Rural Section, appeared on behalf of Defendant.
Plaintiffs' Exhibits 1 through 18 and Defendant's Exhibits A through D were offered and received.
 I. STATEMENT OF FACTS
On July 21, 2008, Defendant advised Plaintiffs that it was initiating the "disqualification process" of the subject property, 17.62 acres "of specially assessed land" located in a nonExclusive Farm Use (EFU) zone, because "an onsite inspection of these properties on July 18, 2008 indicated a lack of farming activity." (Ptfs' Ex 1-5.) Defendant's appraiser, Ed Worcester, wrote that he "observed a pasture full of tall weeds only." (Id.) Plaintiff, who describes himself as an Oregon State University graduate with a forestry degree and a 40 year employee with the United States Department of Agriculture, disputed Defendant's appraiser's "conclusions" in an email dated July 31, 2008. (Ptfs' Ex 1-6.) Plaintiff wrote that the subject property had "been *Page 2 
under lease to a grass farmer since 1972" and "[t]hat lease was terminated in October 2007." (Id.) Plaintiff testified that the lease was terminated because the "grass farmer" was slow in paying Plaintiffs and Plaintiffs were concerned that the soil test pits "might interfere with processing of grass by the big machines." The soil test pits were required as part of Plaintiffs' plan to subdivide the property for their and Plaintiffs sister's heirs. Plaintiff estimated that ".2/100th of the land was out of production for the pits which were dug in March and April and left open for county inspection." Defendant stated that the "holes were dug and left" which "inhibited the growing operation." Plaintiff testified that, even though he planned to "record the subdivision," it was his intent to "keep farming."
Plaintiff stated that the "property has been in perennial ryegrass (Lolium perenne L) the last few years." (Ptfs' Ex 1-6.) Plaintiff noted that "[scattered through the ryegrass this year is some Queen Anne's Lace (Daucus carota L.) or wild carrot — which has been in the species mix when it was under lease to the grass farmer too, but apparently to a lesser extent." (Id) Plaintiff testified that the Queen Anne's Lace grows to heights of "two to four feet" and "can look dominate" against "the perennial ryegrass which grows one to two feet in height." He also testified that, in contrast to prior years, Plaintiffs did not maintain the "eight foot segment fire break," which allowed the "weeds to extend beyond the eight foot fire break." Defendant testified that Queen Anne's Lace "does not belong in a well-maintained farm field." Plaintiff concluded that the subject property "is definitely NOT 'a pasture full of tall weeds only.' The vegetation definitely has an economic value this year, thus clearly meeting the requirements of ORS 308A.056." (Ptfs' Ex 1-6.) Plaintiff reviewed eight photographs of the subject property taken in October, 2008. (Ptfs' Exs 16-1through 16-8.) Defendant submitted ten photographs taken July 18, 2008, two photographs taken August 26, 2008, two photographs *Page 3 
taken September 7, 2008, and two photographs taken September 18, 2008. (Def s Exs A-2 through A-14.) Defendant testified that, as late as September 2008, the cut and baled hay was "still in the field" and the area around the "test holes was still not harvested."
In August 2008, Plaintiffs harvested "234 bales" (or "approximately 21 bales per ton") "of grass hay [which they] sold for $100 per ton * * * for a total value of $1,114." (Ptfs' Ex 1-1.) Plaintiff stated that he paid Paul Johnston, located in Turner, Oregon, $1,000 to cut the grass hay in mid-August 2008. He testified that, in late June when he was looking for "someone to cut the hay, no one was available until August." Plaintiff testified that in August 2008, the rainfall was "120 percent above average," which delayed his contractor. In response to a question from Plaintiff, Defendant testified that, if Plaintiff had harvested in June, the "county probably would have accepted his activity as farming." The parties agreed that, in July 2008, there was "no rain" that would have delayed the harvest. Defendant referenced his Exhibit B, a circular from the Oregon State Extension Service, which stated that "hay" that is harvested in the spring "is more nutritious" and "good quality." (Def s Ex B-1.) Defendant continued, stating that "Plaintiffs' movement toward subdivision (specifically, the "test holes"), neglect of the field including lack of fertilization and weed control, and delay or postponement of harvesting" were "multiple factors" that caused the county to disqualify the subject property. In response, Plaintiff testified that "his land stewardship philosophy" is not "to use fertilizers or chemicals to control weeds." Defendant testified that there was no evidence of any effort to control or manage the weeds and that the subject property does not have "an organic certification."
On August 4, 2008, Defendant notified Plaintiffs that it disqualified 17.62 acres of their land located in a non-exclusive farm use zone from farm use special assessment. (Ptfs' Ex 1-3.) The subject property, which had been specially assessed since 1972, was disqualified because *Page 4 
Plaintiffs failed to "adequately farm the land." (Id.) Plaintiff testified that the "intent of ORS 308A.718(3)" is "for the county to give a reason for the disqualification and "none was given — there was no definition given of "adequate" in the context of "stewardship of the land." He testified that it was "always his intent" to "harvest the "product;" he concluded that from a "good neighbor standpoint" he could not "leave 18 acres" with "product" because it would be "unslightly [and] a fire hazard." Defendant testified that Plaintiffs' "current employment of the land" lacked the required "intent to make a profit" because the "hay" was "worthless" to "low grade" and the "cost ($1,000)" to harvest the hay was almost as much as the revenue generated from the sale of the hay.
In its August 4, 2008, letter, Defendant advised Plaintiffs that they were "eligible to sign up for our abatement program." (Ptfs' Ex 1-3.) Plaintiffs submitted their request to participate in the farm use abatement program on August 21, 2008. (Ptfs' Ex 1-8.) Plaintiff testified that he "spent a lot of time researching the program and sent several emails to the county employees." On August 27, 2008, Defendant notified Plaintiffs that it denied their request, stating that "[offering this program was an oversight on our part," and, because their property was disqualified "based on `lack of adequate use,'" Plaintiffs did not "qualify to participate in the" abatement program. (Ptfs' Ex 1-9.) Defendant stated that Plaintiff would have qualified for the program if the "disqualification" was based on "income."
 II. ANALYSIS
Plaintiffs appeal Defendant's disqualification of their property from farm use special assessment. Plaintiffs allege that they meet the stated legislative intent for special assessment. That intent is to encourage owners of such properties, which "contribute significantly to *Page 5 
Oregon's character and economy," to engage in qualifying farming activities. ORS 308A.050.[1] The legislature found "that providing the means for agriculture to continue and prosper is in the interest of all citizens of this state, who benefit directly or indirectly from agricultural production and stewardship of farmlands and ranchlands."Id.
 Under ORS 308A.068(1),
 "[a]ny land that is not within an exclusive farm use zone but that is being used, and has been used for the preceding two years, exclusively for farm use shall qualify for farm use special assessment:
 "(a) If the land meets the income requirements set forth in ORS 308A.071; and
 "(b) Upon compliance with the application requirements set forth in ORS 308A.077."
The subject property, which is located in a non-EFU zone, qualified in 1972 for farm use special assessment and maintained its qualification until August 4, 2008, when Defendant disqualified the subject property from special assessment.
 ORS 308A.116(1) provides, in pertinent part, that
 "[n]onexclusive farm use zone farmland qualified for special assessment under ORS 308A.068 shall be disqualified from such special assessment upon:
 "* * * * *
 "(c) Removal of the special assessment by the assessor upon the discovery that the land is no longer in farm use for failure to meet the income requirements under ORS 308A.071 or is no longer in farm use."
(Emphasis added.) The definition of "farm use" is "the current employment of land for the primary purpose of obtaining a profit in money" by engaging in farming activities of the *Page 6 
kinds listed in ORS 308A.056(1)(a) to (h).[2] See also Everhart v.Dept. of Rev. (Everhart), 15 OTR 76, 79-80 (1999) (discussing the definition of farm use.) That definition has three basic elements.Id at 79. First, "[t]he use of the word `current' refers to the present use of the land and suggests that the past or future use is largely irrelevant." (Id.) The parties agree that, in 2008, Plaintiffs raised, harvested, and sold a hay crop which is one of the enumerated farming activities listed in ORS 308A.056(1)(a). Plaintiffs' activity, which is the third element of the definition, qualifies as a current "farming" use. Id.
Defendant alleges that Plaintiffs fail to meet the first and second elements of the definition, alleging that Plaintiffs did not employ the land "for the primary purpose of obtaining a profit" and their "employment" was passive rather than active and lacked purpose and direction.
The second element of the definition, "for the primary purpose of obtaining a profit in money," requires a review of "the intent of the user of the land. Inasmuch as intent is a subjective state of mind, it must be induced from objective observable conduct." Id. at 79-80. InEverhart, the court explained that "[f]arm use is not required to actually result in a money profit. * * * The legislature's intent is to grant the special assessment to farmers who exchange their crops for `money.'" Id. at 80. Even though there is no requirement that the farming activity "result in a money profit," Plaintiff testified that he made a "money profit," albeit small. Id.
Property located in a non-EFU zone must meet an income requirement each calendar year. ORS 308A.071. Disqualification can result if "in three out of the five full calendar years immediately preceding the assessment date" the income requirement is not met. Id. at (2)(a). *Page 7 
Because Defendant did not disqualify Plaintiffs' property from special assessment for failure to meet the income requirement, Plaintiffs' property must have met the statutory requirement.
Defendant emphasizes that the land must be employed for "the primary purpose of obtaining a profit in money." ORS 308A.056(1) In response to Defendant's allegation, Plaintiff offered no evidence that Plaintiffs' primary purpose was to earn a profit from his farming activities. To the contrary, Plaintiff testified that it was always his intent to harvest the hay because to do otherwise would not be neighborly and would present a fire hazard. Neither of his stated reasons for harvesting the hay suggests that his farming activities were "for the primary purpose of obtaining a profit in money." Id.
The first element of the definition, "employment" is defined by a present "active, purposeful, directed use of the land." Everhart,15 OTR at 79. Plaintiff opened his testimony by describing to the court the subdivision process for the subject property. He explained how he engaged professional services to plot the five parcels, sought approval from the county planning commission, and is currently working with Oregon Department of Transportation to gain access to the subdivision. Plaintiff testified that, to address the waste disposal system requirements, he was required to drill five widely scattered test holes. Those test holes remained open through the growing and harvesting season. Plaintiff testified that one of the reasons he did not renew the leasing contract with the grass farmer was because he thought the "test holes" would interfere with "the big [commercial harvest] machines." Defendant's photographs support Plaintiff's concern, showing that hay growing close to the test holes was not harvested, even though the field had been harvested and the hay baled. *Page 8 
Plaintiff testified that it was "always his plan to keep farming." He testified that, for many years, the land "has been in perennial rye grass." Plaintiff testified that, after the 2007 crop was sold, "the new crop that was coming up was adequate" and he "hoped to sell it as grass seed." Plaintiff did not testify about his active management of the crop. He testified that he was "watching it," but had to sell the crop "as hay" because, when he looked for someone in late June to harvest the crop, there was no one available. Defendant testified that county representatives visited the subject property during the growing season and they concluded that there was a lack of farming activity. Defendant emphasized that "typical farming practice" requires "harvesting at "the proper time" to capture the "nutritional value" of the crop. Photographs showed that, as late as September 2008, the cut and baled hay remained in the field. Plaintiff's failure to secure harvest services in advance of the optimum harvesting time shows a lack of management and little concern for product quality and subsequent marketability.
Photographs submitted by both parties showed the prevalence of Queen Anne's Lace growing among the perennial ryegrass. Defendant concluded that Queen Anne's Lace does not belong in a "well maintained farm field" and those photographs show a lack of "active, purposeful care of the crop." Plaintiff acknowledged that, given the height of the Queen Anne's Lace in contrast to the perennial ryegrass, Queen Anne's Lace "stood out," and he conceded that, in contrast to prior years, Queen Anne's Lace was more prevalent. Plaintiff presented no evidence to show that, given the invasiveness of Queen Anne's Lace, he manually hand-pulled or mowed the Queen Anne's Lace "close to the ground before seed set in mid to late summer" as stated in the Control and Management section of his Exhibit 4. Unfortunately, the photographs are not supportive of Plaintiff's assertion that his management efforts and stewardship combined to meet the statutory definition of farm use. *Page 9 
Even though Plaintiff's intent was to keep the subject property in farm use, Plaintiff's attention and efforts in 2008 were directed to subdivision of the land. There is no evidence showing that Plaintiff's employment of the subject property was an "active, purposeful, directed" farm use. Everhart, 15 OTR at 79. The evidence and Plaintiff's own testimony strongly support the conclusion that Plaintiff's actions and activities were primarily directed to securing subdivision of the land.
Defendant erroneously stated that Plaintiffs were "eligible to sign up for our abatement program." (Ptfs' Ex 1-3.) Plaintiffs signed the Farm Use Abatement Program form, stating that they wanted "to participate in that program." (Ptfs' Ex 1-8.) To participate in the farm use abatement program, the owner agrees "to continue farming the property." (Id.) Even though Plaintiffs concluded that they were farming the property, Defendant, in its disqualification letter dated August 4, 2008, clearly stated that the property was disqualified "for failure to adequately farm the land." (Ptfs' Ex 1-3.) After receipt of Plaintiffs' application to participate in the program, Defendant denied Plaintiffs' request. (Ptfs' Ex 1-9.) It is unfortunate that Defendant's letter stated that Plaintiffs were "eligible to sign up for" the abatement program, which required that the land be farmed, at the same time Defendant concluded that Plaintiffs' property was disqualified because it was not in farm use. Defendant's act to offer the abatement program and then deny Plaintiffs' request did not change or nullify its original act, which was to disqualify Plaintiffs' property, but it further added to Plaintiffs' dissatisfaction with Defendant. The court cannot grant Plaintiffs' request to participate in the abatement program after concluding that Plaintiffs' use of their land fails to meet the statutory definition of farm use. *Page 10 
 III. CONCLUSION
Even though the subject property has been in farm use special assessment since 1972, Plaintiffs failed in 2008 to employ their land, in "an active, purposeful and directed use," for "the primary purpose of obtaining a profit in money." Everhart, 15 OTR at 79. Now, therefore,
IT IS THE DECISION OF THIS COURT that Plaintiffs' appeal is denied.
Dated this day of March 2009.
JILL A. TANNER
Presiding Magistrate
If you want to appeal this Decision, file a Complaint in the RegularDivision of the Oregon Tax Court, by mailing to: 1163 State Street,Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 StateStreet, Salem, OR.
 Your Complaint must be submitted within 60 days after the date of theDecision or this Decision becomes final and cannot be changed.
 This document was signed by Presiding Magistrate Jill A. Tanner onMarch 5, 2009. The Court filed and entered this document on March 6,2009.
[1] All references to the Oregon Revised Statutes (ORS) are to the 2007 year.
[2] ORS 308A.056(1), provides, in pertinent part:
 "(1) As used in ORS 308A.050 to ORS 308A.128, `farm use' means the current employment of land for the primary purpose of obtaining a profit in money by:
 "(a) Raising, harvesting and selling crops[.]" *Page 1