IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

| | | |
|---|---|---|
| ANTHONY FAZIO, III,<br>and FAZIO JOINT TRUST | ) | |
| | ) | |
| Plaintiffs, | ) | TC-MD 230346N (Control) |
| | ) | |
| v. | ) | |
| | ) | |
| MULTNOMAH COUNTY ASSESSOR, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| FAZIO JOINT TRUST, | ) | |
| | ) | |
| Plaintiff, | ) | TC-MD 230383R |
| | ) | |
| v. | ) | |
| | ) | |
| MULTNOMAH COUNTY ASSESSOR, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| ANTHONY FAZIO, III, and<br>FAZIO JOINT TRUST, | ) | |
| | ) | |
| Plaintiffs, | ) | TC-MD 230422R |
| | ) | |
| v. | ) | |
| | ) | |
| MULTNOMAH COUNTY ASSESSOR, | ) | |
| | ) | |
| Defendant. | ) | **DECISION** |

This matter came before the court on the parties' cross-motions for summary judgment

for the 2022-23 tax year, and Defendant's motion to dismiss Plaintiffs' appeal for the 2023-24

tax year. At issue for the 2022-23 tax year is whether two parcels in Northeast Portland,

identified as Accounts R238955 and R238956 (subject properties), qualify for farm use special

assessment. Defendant moves to dismiss Plaintiffs' 2023-24 appeal as "duplicative" of the 2022-23 appeal. (Def's Resp to Ptfs' Mot for Leave to Am Compl at 3.) If Plaintiffs "prevail on their other complaints, this [2023-24] Complaint is moot because the rolls would be corrected going forward, including the 2023-24 tax year." (*Id.* at 3-4.) Oral argument was held remotely on January 26, 2024. Carol Vogt Lavine, Oregon attorney, appeared on behalf of Plaintiffs. Louisa McIntyre, Assistant County Attorney, appeared on behalf of Defendant.

## I. STATEMENT OF FACTS

Plaintiff Anthony Fazio III (Fazio) uses the subject properties in his operations Fazio Farms, LLC, and Fazio Landfill & Recycling, LLC. (Ptfs' Cross MSJ at 42 and 28, Decl of Lavine, Ex 1 at 1; Decl of Fazio at 1.) Fazio Farms has been in business since 1919, primarily growing and packing pickling cucumbers but also raising cattle and growing other crops, such as beets and cabbage. (Ptfs' Cross MSJ at 4, 42, Lavine Decl, Ex 1 at 3.) Fazio Farms conducts activities on a 650-acre parcel of land zoned Exclusive Farm Use (EFU) on Sauvie's Island, as well as on the subject properties. (Ptfs' Cross MSJ at 28 and 42, Decl of Fazio at 1; Lavine Decl, Ex 1 at 3.) The subject properties were re-zoned from EFU to industrial in the mid-1990s, but thereafter qualified for non-EFU special assessment. (Ptfs' Cross MSJ at 42, Decl of Lavine, Ex 1.) The subject properties total approximately 60 acres and Defendant disallowed special assessment for 41.54 acres.[1] (Compl at 5 in 230346N; Ptfs' Cross MSJ at 42, Decl of Lavine, Ex 1 at 1; Am Compl at 1 in 230422R.)

/ / /

/ / /

---

[1] Plaintiffs' Complaint in 230346N alleges that Defendant disallowed special assessment to 41.54 acres out of 58.01 acres total sought. (Compl at 5.) However, in their Amended Complaint for 230422R, Plaintiffs alleged that Defendant disallowed special assessment to 39.6 acres. The discrepancy was not explained.

A.     *Soil Fungus Infestation and Certified Remediation Plan*

Beginning in the mid-1990s, the subject properties were infested by a fungus that impacted cucumbers and other related crops, such as pumpkins and squash. (Ptfs' Cross MSJ at 33 and 42, Bubl Decl at 2; Lavine Decl, Ex 1.) Fazio communicated with an OSU Extension Agent who visited the subject properties "many times" over a period of 17 years. (Ptfs' Cross MSJ at 33, Bubl Decl, Ex 1.) The agent noted that, in addition to the fungus problem, the subject properties had a second problem: "the elevation was too low to successfully produce alternate income producing non-host crops." (*Id.*) With the approval of the agent, Fazio sought "to correct two problems with one approach[:] keeping the ground fallow while adding soil to eliminate low-level flood prone areas, thus increasing their options for rotation crops." (*Id.*)

To raise the elevation of the subject properties and add clean soil, Fazio initially contracted with third parties, but both contracts proved insufficient or otherwise fell apart. (Ptfs' Cross MSJ at 42, Lavine Decl, Ex 1 at 3.) As an alternative solution, in late 2002, Fazio began operating his own landfill on the subject properties, Fazio Landfill & Recycling, LLC. (*Id.*; Ptfs' Cross MSJ 28, Fazio Decl at 1.) In 2008, the OSU Extension Agent wrote a letter describing the fungus problem and approving of Fazio's strategy to mitigate it. (Ptfs' Cross MSJ at 33, Bubl Decl, Ex 1 at 2.) The letter did not expressly reference the landfill but said Fazio "chose a sound management strategy to mitigate" the fungus and noted the "challenge" of "how to economically add soil and elevate ground on a large scale." (*Id.*)

As of 2009, Fazio's landfill was "open to the public and encourage[d] the dumping of clean soil, waste asphalt, concrete, and gravel products. The landfill sort[ed] and process[ed] the waste into marketable rock, masonry products and soil which [were] actively sold to the public or used on the farm for roads and to raise the soil elevation." (Ptfs' Cross MSJ at 42, Lavine's

Decl, Ex 10 at 3 (Feb 6, 2009, (letter from Gary Wright, Department of Revenue property tax division).)

After the first OSU Extension Agent retired, a new agent assumed oversight of Fazio's remediation plan beginning in 2015. (Ptfs' Cross MSJ at 33, Bubl Decl at 2.) In the 2015 Certification of Remediation Plan, he reiterated the "two elements" of the plan: 1) to fallow the land for at least six years or longer; and 2) to raise the subject properties to a higher grade to grow more diverse crops. (*Id.* at Ex 2.) With respect to the first element, he wrote that the properties were "seven years into a 'cucumber' fallow." (*Id.*) With respect to the second element, he wrote "that work is still in progress but * * * a lot has been done * * *." (*Id.*) The "remaining land work include[d] shaping, rock 'picking', addition of organic matter where indicated, and some connections to drainage work in coordination with the drainage district's planned improvements in the area." (*Id.*) The agent also noted Fazio had "several years of a corn maze" and planned to add a farm stand to market products from Fazio Farms holdings. (*Id.*)

B.      *Status of Remediation, Other Activities as of 2022-23 Tax Year*

In October 2022, the OSU Extension Agent again visited the subject properties and spoke with Fazio. (Ptfs' Cross MSJ at 33, Decl of Bubl, Ex 3.) In the 2022 Certification of Remediation Plan, he wrote:

> "The rotation and soil raising has allowed Mr. Fazio to grow pumpkins every other or every third year successfully on the prior infested parcels with little or no disease loss. In the years without pumpkins, he has, at various times, grown spring wheat; fallowed it for the summer; grown corn for corn maze (for agritourism); and has harvested spring grain and/or weeds from the semi-fallow fields for hay in certain years."

(*Id.*) The agent explained that fallow hay reduces disease presence, provides organic matter for the soil, and improves soil biology and drainage. (*Id.*) Fazio "will need to stick to his every other or every third year cycle for pumpkin planting on the previously infested parcels and stay

alert for any signs of significantly diseased plants." (*Id.*) With respect to Fazio's efforts "to build up" soil, the agent noted a problem when someone Fazio hired failed to remove chunks of concrete, so "some of the areas raised will have to be 're-sifted' * * *." (*Id.*)

The agent visited the subject properties again in March 2023, concluding that Fazio's "remediation efforts are consistent with the Certified Plan developed and implemented in 2008." (Ptfs' Cross MSJ at 33, Bubl Decl at 4.) Defendant's appraiser joined that March 2023 visit and observed:

> "Several piles of sorted rock and soil cover lower 2/3 of property. Some pile[s] not touched in 3 to 4 years (pile 6). Trees growing out of some piles as they have not been disturbed. Most piles covered with grass. Large concrete pile for future bridge project on property, not part of remediation plan."

(Swackhamer Decl in Support of Def's Cross MSJ, Ex A at 19.) Based on those observations, she concluded a person could not "perform[] a farm use activity pursuant to ORS 308A.056 in those 22.97 acres." (*Id.* at 3-4.)

Fazio explained the various piles as follows:

> "There are five large piles of materials on the Subject Property. The biggest pile consists of sandy loam topsoil. Two piles have regular fill dirt, which might contain small pieces of brick and concrete suitable for compaction. One pile is rocky, gravelly soil which is used as a base for drainage. The other pile has dirt mixed with concrete and asphalt, which must be separated and screened. This is usually as time permits."

(Ptfs' Cross MSJ at 28, Fazio Decl at 4.) He attributed the slower pace of work during the 2022-23 tax year due to labor shortages and weather problems. (*Id.* at 5.) Despite Fazio's slower pace sorting materials, Defendant acknowledged Fazio "continuously add[ed] materials to his piles, including during the at-issue tax year, as part of the landfill operation." (Def's Resp at 15.[2]) "In

---

[2] Plaintiffs provided seven photographs taken in September 2023, to which Defendant objected because they were not produced in discovery and are not relevant to the 2022-23 tax year. (*See generally* Def's Mot to Strike.) Plaintiffs respond that the photographs were not intentionally withheld and were meant "simply as an aid to the Court in understanding the remediation process that has continued beyond the disqualification date." (Ptfs'

July 2022, the landfill grossed $14,793.56 [and in] October 2022, it grossed $9,022.45." (Def's MSJ at 8.)

In addition to the landfill-related activities, Fazio continued to operate the corn maze and pumpkin patch. (Ptfs' Cross MSJ at 33, Bubl Decl, Ex 3; Decl of McIntyre in Supp of Def's Resp, Ex F at 1.) As of fall 2023, Fazio charged $5 to enter the corn maze, sold pumpkins priced by size, sold "u-cut" sunflowers for $1 per stem, and sold "corn stalks, pickles, etc." in a "produce tent." (Decl of McIntyre in Supp of Def's Resp, Ex F at 4-5; Ptfs' MSJ, Ex 6.[3]) The pickles sold were grown on the Sauvie's Island parcel. (Ptfs' Cross MSJ at 28, Decl of Fazio at 2-3.) Although Fazio did not sell ears of corn, he sold leaves for tamales and stalks for decorations. (*Id.* at 2.) Fazio maintains that "[t]he primary purpose of the corn maze was to develop organic matter for the soil, * * * to help defray the cost of remediation, [and] to also market and sell our farm produce." (*Id.*) In Defendant's view, the primary purpose of the corn maze was for entertainment. (Def's Resp at 24-25.)

C.     *History of Farm Use Special Assessment for Subject Properties*

The subject properties were in farm use special assessment until 2008, when Defendant determined they should be disqualified based on a lack of farm use. (Ptfs' Cross MSJ at 42, Decl of Lavine, Ex 1 at 4-5.) The Department of Revenue reviewed the subject properties in 2009 and concluded that the landfill area was properly disqualified. (Decl of Lavine, Ex 10.[4]) In 2009, Fazio sought a legislative change to allow remediation as a permissible farm use qualifying a

---

Objection to Mot to Strike at 2.) Upon consideration, the court accepts the photographs as illustrative of the overall remediation process rather than specific activities undertaken in the 2022-23 tax year.

[3] The court did not receive information on 2022 prices. Presumably they were similar to 2023.

[4] With respect to the "low elevation row crop area," the department noted it was under appeal in this court but might be considered "wasteland" if Fazio could not restore it to farming. (Decl of Lavine, Ex 10.)

property for special assessment. That change passed, was signed into law, and was applied retroactively, providing continuous special assessment for the subject properties. (*See* Ptfs' Cross MSJ at 42, Decl of Lavine, Ex 5.) Thereafter, the subject properties remained in special assessment until the 2022-23 tax year when they were disqualified for Plaintiffs' failure to timely respond to the gross income questionnaire. (Ptfs' MSJ at 16.)

After Defendant disqualified the subject properties for the 2022-23 tax year, Plaintiffs sought to requalify them. (Decl of John James at 2-3.) Defendant granted special assessment to 16.5 acres where Fazio grew pumpkins and denied the balance. (*Id.* at 4.) Defendant denied special assessment for a landfill (23 acres), a corn maze (7 acres), parking (3 acres), and a "small remediation area." (*See* Def's Resp at 25; Swackhamer Decl, Ex A at 19, 21-22.[5]) For the 2023-24 tax year, Defendant assessed additional back taxes on Account R238955 associated with 22.97 acres disqualified from special assessment. (Am Compl in 230422R.) For the 2023-24 tax year, both accounts reflect potential additional tax. (*Id.*) Plaintiffs allege that the tax statements are erroneous because the subject properties continue to qualify for special assessment. (*Id.*)

## II. STATEMENT OF ISSUES AND STANDARD OF REVIEW

The issue for the 2022-23 tax year is whether any part of the subject properties beyond the pumpkin patches qualify for non-EFU farm use special assessment.[6] The parties agree that the subject properties satisfied statutory income requirements, so the question is whether Fazio's other activities at the subject properties qualify as "farm use" within the meaning of ORS

---

[5] The subject properties also include two one-acre homesites excluded from farm use special assessment. (*See* Swackhamer Decl, Ex A at 1, 21-22; Ptf's Ex 10 at 1.)

[6] There is a potential second issue for the 2022-23 tax year that the court did not reach in this analysis based on its conclusion that the subject properties qualified for farm use special assessment. To the extent any part of the subject properties did not qualify for farm use special assessment for the 2022-23 tax year, a second issue is whether that non-qualifying use was "incompatible with a purpose to return the land to farm use[,]" requiring imposition of additional taxes under ORS 308A.703. *See* ORS 308A.706(1)(a)(B) (2021).

308A.056.[7] The issue for the 2023-24 tax year is whether Plaintiffs' appeal should be dismissed as duplicative or moot.

As the party seeking affirmative relief, Plaintiffs ultimately bear the burden of proof by a preponderance of the evidence. ORS 305.427. A "[p]reponderance of evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Rev.*, 4 OTR 302, 312 (1971). The court grants a motion for summary judgment when, viewing the facts in a manner most favorable to the adverse party, no genuine issue of material fact exists, and the moving party is entitled to prevail as a matter of law. TCR-MD 13; TCR 47 C.[8]

## III. ANALYSIS

The court begins its analysis with an overview of the farm use special assessment statutes and the addition of the remediation provisions in 2009. The court next considers whether discrete activities on the subject properties – the landfill, the "small remediation area," and the corn maze and parking lot – qualify for farm use special assessment for the 2022-23 tax year. Finally, the court addresses the impact of its conclusions on the additional taxes imposed.

A.      *Overview of Farm Use Special Assessment, Addition of Remediation Provisions*

To promote agricultural production and stewardship of farmland, the legislature established a program of special assessment for "bona fide farm properties." ORS 308A.050. The special assessment statutes set more stringent requirements for land in a non-EFU zone than land in an EFU zone. *Compare* ORS 308A.062 *with* ORS 308A.068. "Land in a [non-EFU] zone qualifies for special assessment if it is used exclusively for farm use, has been so used for the preceding two years, meets certain income requirements, and fulfills application

---

[7] The court's references to the Oregon Revised Statutes (ORS) are to 2021.

[8] Tax Court Rules-Magistrate Division (TCR-MD) and Tax Court Rules (TCR).

requirements." *Wehde v. Dept. of Rev.*, 21 OTR 506, 508 (2014), *citing* ORS 308A.068(1).

Both EFU and non-EFU land must be used "exclusively for farm use." *See* ORS 308A.062, ORS 308A.068. "Farm use" is defined as "the current employment of land for the primary purpose of obtaining a profit in money by" doing one of the specifically enumerated farm activities listed. ORS 308A.056(1); *see also Wehde*, 21 OTR at 513, *citing Everhart v. Dept. of Rev.*, 15 OTR 76, 79 (1999). Enumerated activities relevant here include "[r]aising, harvesting and selling crops"; "disposing of, by marketing * * * the products * * * raised * * * on land described in this section"; and "[i]mplementing a remediation plan previously presented to the assessor * * *." ORS 308A.056(1)(a), (h).

"Implementing a remediation plan" was added to the statute in 2009 at the request of then Representative Kotek, based specifically on Fazio's challenges with the fungus. *See* 2009 Or Laws ch 776, *see also* Ptfs' Cross MSJ at 42, Decl of Lavine, Exs 2, 4, 8, 11. Fazio testified to the House Committee on Agriculture, Natural Resources, and Rural Communities describing the history of the subject properties and his efforts to combat the fungus in accordance with the certified remediation plan developed by the OSU Extension Service. (Ptfs' Cross MSJ at 42, Decl of Lavine, Ex 2 at 13-32.) In his testimony, Fazio described the landfill operation, success planting wheat on remediated land,[9] and plans for a pumpkin patch and corn maze. (*Id.* at 22-25, 27, 31-32.) Lavine testified to the committee concerning the need for this legislation because Defendant had disqualified the subject properties from farm use special assessment based on a lack of qualifying farm use. (*Id.* at 6-11.)

---

[9] As Defendant notes, Fazio may have presented an overly optimistic view of the remediation efforts to the legislature when he described his success with wheat. (*See* Def's MSJ at 6.) Although Fazio planted wheat in 2008 "in order to meet the qualifications" for special assessment, he ultimately "found that the yield was insufficient to break even due to the lack of sufficient organic material to yield a good crop." (Ptfs' Resp at 2.)

In response, the legislature added "implementing a remediation plan" to the list of "farm use" activities, adopted additional definitions related to remediation, and created a potential additional tax associated with farm use special assessment pursuant to a remediation plan. *See* ORS 308A.053(5), (6), ORS 308A.056(1)(h), ORS 308A.703(4). Defendant sought to add a time limit on remediation, but the legislature declined to do so. (*See* Ptfs' Cross MSJ at 42, Decl of Lavine, Ex 2 at 39-40 (testimony of Walruff, Multnomah County Assessor, proposing amendment to limit period of remediation to three or five years or add good cause requirement); Ex 11 at 16-18 (testimony of Tomkins, Multnomah County Counsel, proposing that legislature clarify period of time in which remediation must be complete to avoid "a parcel of land that's essentially non-farming in perpetuity"). The legislature seemingly accepted that remediation might be lengthy and require multiple remediation plans. (*Id.,* Ex 11 at 23-24 (statement by Rep Riley ("I personally can see instances where the remediation, no matter how well intentioned, didn't quite get there and a new plan would have to be filed * * * to actually continue * * * and complete remediation. I personally have a problem with * * * eliminating that possibility")).) Instead, the legislature added a potential additional tax if the land was not returned to farming.

With that background in mind, the court turns to a review of whether the landfill and remediation area qualify for farm use special assessment under the remediation provisions and whether the corn maze and gravel parking lot qualify as "raising, harvesting, and selling crops" or "disposing of, by marketing" farm products raised on the land.

B.      *Landfill and "Small Remediation Area"*

Plaintiffs argue that the landfill and remediation area qualify as farm use because they are subject to and used for implementing Fazio's remediation plan. Plaintiffs rely primarily on the legislative history, which "leave[s] no doubt that the landfill is a critical first step in the

remediation process[,]" and also relies upon the 2022 certified remediation plan from the OSU extension agent. (Ptfs' Cross MSJ at 18, Resp at 10.) Plaintiffs note that Fazio "had been operating the landfill for nine years" by the time of the 2009 legislative session and the legislators enacted the statutory amendments with full knowledge and approval of the landfill. (Ptfs' Cross MSJ at 20.) In 2022, the OSU extension agent affirmed that the remediation plan remained viable and that Fazio's activities accorded with the plan. (Ptfs' Resp at 10.)

Defendant disagrees that the landfill or remediation area qualify for special assessment as remediation. (Def's Cross MSJ at 4.) Defendant argues that Fazio's use of those areas is unable to satisfy any of the three discrete requirements for farm use in ORS 308A.053(1): the current employment of land, for the primary purpose of obtaining a profit in money, and through an enumerated activity. (*Id.* at 15, 26, 31-33; Def's Resp at 9-16.[10]) Defendant's position can be summarized as follows: the only qualifying remediation activities were soil addition or crop rotation, neither of which was occurring during the 2022-23 tax year, and the landfill was mere preparation for remediation but not itself remediation. (*See* Def's Resp at 12-13.)

No court has previously construed the remediation amendments adopted in 2009, so the court does so here, following the framework for statutory interpretation set forth in *State v. Gaines*, 346 Or 160, 172, 206 P3d 1042 (2009). The court's goal is to discern the legislature's intent and does so by first examining the text and context, then considering legislative history that is "useful to the court's analysis," and finally consulting general maxims of statutory construction to resolve any remaining uncertainty. *Id.* at 171-172. Here, the court finds

_____

[10] Defendant also cites ORS 308A.091, which states: "Only the portions of farmland on which the remediation plan is actually implemented qualify for farm use special assessment * * *." (Def's MSJ at 27-28.) Defendant argues that this "provision reinforces the requirement that the remediation use be *current* and that the plan must be *actually* implemented * * *." (*Id.* (emphasis in original).) The court considers this argument along with Defendant's argument that remediation was not the "current employment of land."

legislative history useful because the remediation provisions were adopted specifically in response to the subject properties. (*See* Def's Cross MSJ at 6 (describing the amendments as a "bespoke legislative fix" adopted even though "[i]t was clear that the legislative change would affect only [Plaintiffs]").[11])

The court begins with the statutory text and context. A "remediation plan" is "a plan certified by an extension agent of the Oregon State University Extension Service to remediate or mitigate severe adverse conditions on farmland." ORS 308A.053(5). "Severe adverse conditions on farmland" are defined as "conditions that render impracticable continued farm use and that are not due to an intentional or negligent act or omission by the owner, tenant or lessee of the farmland or the applicant for certification of a remediation plan." ORS 308A.053(6). The parties agree that subject properties were impacted by "severe adverse conditions" and that a qualifying remediation plan was in effect for the 2022-23 tax year, though Defendant disputes that the plan included the landfill.

"Implementing a remediation plan" is one of nine enumerated "farm uses" subject to a general definition of "farm use": "the current employment of land for the primary purpose of obtaining a profit in money * * *." ORS 308A.056(1). Despite defining remediation as "farm use," the legislature retained an understanding that remediation is something distinct from farm use, the goal of which is to return land to farm use. That is demonstrated by statutory context.

---

[11] Representative Kotek explained the purpose of the proposed amendment: "at the end of the day, this is about one farm close to being a century in operation in an * * * urban area, much beloved. People want it there." (Ptfs' Cross MSJ at 42, Decl of Lavine, Ex 2 at 50.) Representative Clem similarly approved of Fazio's goal to maintain a farm within the urban growth boundary despite the development potential. (*Id.* at 25-26.) Representative Berger confirmed that the subject properties were the only known farm parcels that would fall within the remediation amendments and Cleave testified that the Department of Agriculture anticipated "maybe one or two a decade statewide." (*Id.*, Ex 11 at 11-12.) Representative Berger voted for the bill after feeling "satisfied that we are really helping farms and not opening a door that we don't want to [-] to a whole bunch of special exemptions." (Ptfs' Resp, Ex 18 at 22-23.)

As noted above, a "remediation plan" is required to address "severe adverse conditions on farmland * * * that render impractical continued farm use * * *." ORS 308A.053(6). If land that was previously qualified for special assessment pursuant to a remediation plan is disqualified within five years, an additional tax is assessed unless the remediation was implemented in good faith and failed "to render continued farm use practicable." ORS 308A.703(4)(b)(B). Each of those statutes reveals the legislature's understanding that remediation is not itself farm use but, rather, an activity designed to return a property to farm use.

Legislative history supports the view that remediation was distinct from farm use, notwithstanding the statutory definition. In 2009, Lavine testified to the House Committee on Agriculture, Natural Resources, and Rural Communities that "it's clear that the Fazios have intended to return their land to farming." (Ptfs' Cross MSJ at 42, Lavine Decl, Ex 2 at 10.) Walruff testified that the bill would prevent "disqualification when severe adverse conditions on land prevent this farming and the measures required to return the land would take more than one year to implement" and sought an amendment to ensure "that the farmer will return to farming the land after competition of the remediation plan." (*Id.* at 38-39.) Fazio wrote that he planned to "wind down [the] rubble crushing operation so as to return entire site to farming." (Ptfs' Cross MSJ at 42, Lavine Decl Ex 8 at 2.) Representative Kotek wrote to the Senate Committee on Finance and Revenue that "[t]he bill also requires * * * a return to farm use after the plan is completed * * *." (Ptfs' Cross MSJ at 42, Lavine Decl Ex 4 at 1.) Shawn Cleave, representing the Oregon Farm Bureau, testified to the House Revenue Committee that "there is a clawback period so that you do have to farm post-remediation for a period." (Ptfs' Cross MSJ at 42, Lavine Decl Ex 11 at 7-8.) Tomkins testified expressing concern "that there be a return to farming after the period of remediation." (*Id.* at 15.)

Putting the text, context, and legislative history together, the court concludes that the general statutory definition of "farm use" in ORS 308A.056(1) must be viewed in accordance with the legislature's understanding of remediation as a potentially lengthy activity designed to return land to farming. For example, this court has previously construed the term "current employment" to mean that "the law ignores the past, and any intentions with regard to future use." *Everhart*, 15 OTR at 79. Yet, remediation is a process that exceeds one year and aims to restore land to farming, so the court must consider more than the current year to understand the employment of land in the case of remediation.

1.      *Whether the landfill was itself remediation*

To qualify for farm use special assessment, the landfill must fall within the activity of "implementing a remediation plan * * *." ORS 308A.056(1)(h). Plaintiffs describe the landfill as "a critical first step in" and "an integral part of the remediation process." (Ptfs' Cross MSJ at 18, Ptfs' Resp at 9.) The landfill is used to bring in soil and fill materials. (Ptfs' Cross MSJ at 11-13.) Defendant argues that the landfill, and related piles of material to be sorted, are not themselves remediation but, rather, preparation for remediation. Defendant compared it to farm use cases in which taxpayers were denied special assessment based on preparatory activities, such as tilling the land, purchasing equipment, and installing irrigation. (Def's Resp at 12-13, *citing Long v. Marion County Assessor*, TC-MD 070681C, 2008 WL 353238 (Or Tax M Div, Feb 6, 2008), and *Lippert v. Jackson County Assessor*, TC-MD 991240C, 2000 WL 291730 (Or Tax M Div, Feb 7, 2000).) Defendant reasons that Fazio was not *implementing* a remediation plan, but rather *preparing* to do so. Defendant's position finds some support in the fact that Fazio's remediation plan did not explicitly reference the landfill, but instead focused on adding soil and improving drainage. (*See* Ptfs' Cross MSJ at 33, Bubl Decl Exs 1-3.) However, the

ultimate question is one of legislative intent.

From the legislative history, there is no doubt that the legislators were aware of Fazio's landfill and understood the landfill to qualify for farm use special assessment as remediation. In written testimony to the House Committee on Agriculture, Natural Resources, and Rural Communities, Lavine described the start of landfill in late 2002 and disqualification in 2007. (Ptfs' Cross MSJ at 42, Lavine Decl, Ex 1 at 4-5.) Fazio described the landfill in both oral and written testimony to the committee. (Ptfs' Cross MSJ at 42, Lavine Decl Ex 2 at 21-25, 27, 43, Ex 8.) Chair Clem stated, in reference to Fazio's activities, "this is clearly real farming." (*Id.* at 43.) In response to Defendant's proposal to limit to 50 percent the exemption for machinery and equipment "used for both remediation and some other commercial or industrial purposes[,]" Representative Roblan expressed "concern" because he would not want a small amount of non-farm use, such as selling a few loads of gravel to a neighbor, to trigger a 50 percent reduction in the exemption. (*Id.* at 46-48.) The court concludes that Fazio's operation of the landfill qualifies as implementing the remediation plan.

2.   *Whether remediation was "current employment" of landfill and remediation area*

The next question is whether "implementing a remediation plan" was the "current employment" of the landfill and remediation area. ORS 308A.056(1)(h). On this question, Plaintiffs largely rely on the Extension Agent's expertise. (*See* Ptfs' Resp at 5.) The agent visited the subject property in October 2022 and again in March 2023, concluding that Fazio's "remediation efforts are consistent with the Certified Plan * * *." (Ptfs' Cross MSJ at 33, Bubl Decl at 4.) Plaintiffs note that "'remediation' is a process" and that it is "ongoing." (Ptfs' Resp at 9-10.)

/ / /

Defendant argues that Fazio's slow progress, as evidenced by piles of materials sitting untouched for years, cannot qualify as "current" use. (*See* Def's Resp at 13-14.) Defendant maintains that activities outside of the tax year at issue are irrelevant, as are financial or weather problems that commonly afflict farms. (*Id.*, *citing Everhart*, 15 OTR at 79 ("The use of the word 'current' refers to the present use of the land and suggests that the past or future use is largely irrelevant"), *Meyer v. Wasco County Assessor*, TC-MD-050682E, 2006 WL 212105 (Or Tax M Div., Jan 17, 2006) (taxpayer unable to plant due to a blackberry infestation, dry winter, and lack of funds; could not keep animals due to cougar problem).) Plaintiffs respond that those cases are irrelevant as they predated the remediation amendment.

As discussed above, the legislature added remediation as a qualifying farm use activity with the understanding that it required more than one year to accomplish. The statutes already granted farm use special assessment to "[l]and lying fallow for one year as a normal and regular requirement of good agricultural husbandry[.]" ORS 308A.056(3)(b). The remediation amendment was added in part because that provision was insufficient to address the subject properties' fungal infestation. (*See* Ptfs' Cross MSJ at 42, Decl of Lavine, Ex 2 at 38 (testimony of Walruff, explaining that "[u]nder the current law, farmland is disqualified from special assessment if it lies fallow for more than one year").) The legislature rejected a proposed amendment to place a time limit on remediation, instead opting to impose an additional penalty if land is not returned to farming after remediation. (*See infra* 10, 13.) Taking all that together, the court concludes that the legislature understood remediation as an activity that spanned multiple years and must be viewed accordingly.

There is no dispute that the landfill was open and operating during the 2022-23 tax year, so that use was current. Fazio's specific activities in the "small remediation area" are less clear,

though Defendant does not dispute that the area was subject to the remediation plan. (*See, e.g.,* Swackhamer Decl, Ex A at 19 (describing "small remediation area"). Defendant argues that area was unused or underutilized. Special assessment was "not designed merely to provide tax relief to those who mechanically follow some statutory minimum." *Beddoe v. Dept. of Rev.*, 8 OTR 186, 189 (1979).[12] But the use of land must be understood in the context of the farm operation.

The *Wehde* case provides a helpful example illustration of that principle. 21 OTR at 507, 514. In *Wehde*, the court found that 18.97 acres used for bee foraging qualified for special assessment even though the hives and access roads were contained on a single acre. *Wehde*, 21 OTR at 507, 514. The defendant argued the land was underutilized, but evidence demonstrated that bees forage within an 8,000-acre radius of the hive and require access to plants free of pesticides. Thus, it was not possible to grow crops on the acres used for foraging. *Id.* at 514.

Here, the remediation plan contemplated that the land subject to remediation would be "less productive" between crop rotations. (Ptfs' Cross MSJ at 33, Bubl Decl, Ex 3 at 2.) The plan called for two- or three-year rotations of crops in the squash family, the use of "fallow hay," and monitoring for signs of diseased plants. *Id*. at 2. It is understandable that a "small remediation area" might be unused or underutilized at a point in time and generally less productive during remediation. The court is persuaded that the small remediation area was currently used for remediation.

3. *Whether the primary purpose of remediation was "obtaining a profit in money"*

ORS 308A.056(1) defines farm use as having a "primary purpose of obtaining a profit in money" from one of the enumerated activities. Plaintiffs maintain that requirement was satisfied

---

[12] *But see Everhart*, 15 OTR at 77, 85-86 (distinguishing *Beddoe* and granting special assessment where "[t]axpayers went to the assessor's office and asked what was required to maintain special farm-use assessment" and, in response, purchased "five 'pair' of sheep * * * and placed them on the property").

because the statutory gross income requirement was satisfied. (Ptfs' Resp at 7.) Defendant acknowledges that it is "impractical" to expect a profit from remediation, but such intent is nevertheless required based on the statutory text. (Def's Resp at 10.) Moreover, neither "indirect profits" – such as from the landfill – nor efforts to restore future profitability can satisfy the test. (*Id.* at 10-11, *citing Everhart*, 15 OTR at 81 ("Indirect profits, such as savings on family food budgets, and indirect expenses, such as invested capital, are excluded from consideration") and *Ramsay v. Marion County Assessor*, TC-MD 021042A, 2002 WL 32107254 at *1 (Or Tax M Div, Dec 6, 2002) ("Although it can be argued that plaintiffs' laudable efforts may restore the subject property to profitable future activities, the statutory language requires current use for profits * * *").[13])

The profit purpose requirement is closely related to the legislature's goal of ensuring that only *bona fide* farm properties receive special assessment. ORS 308A.050. *Bona fide* farms are contrasted with "hobby" farms, used for personal activities such as keeping a "pleasure horse." *See Beddoe*, 8 OTR at 188-189 (denying special assessment for 8.47-acre pasture with two "pleasure horses"); *see Ameral v. Dept. of Rev.*, 14 OTR 56 (1996) (denying special assessment to 197.7-acre parcel which taxpayer bartered to another person the right to pasture four pleasure horses for a month or two each year); *see Everhart*, 15 OTR at 80 (observing "that the legislature viewed bona fide farms as those farms that produced products or crops sold in the open market. Small operations such as raising chickens for family use or a few pigs to trade with a neighbor

---

[13] *Ramsay* relies on *Shepherd v. Dept. of Rev.*, 8 OTR 122 (1979), a case that predated the addition of "remediation" to the statutory framework and that likely would have come out differently had remediation been an approved farm use at the time it was decided. In *Shepherd*, the taxpayers, "upon the recommendation of a county extension agent and under the direction of the county extension service," removed their cattle to pursue "a program to control" tansy ragwort, fatal to livestock, "through the use of the cinnabar moth caterpillar." *Id.* at 124. The court reasoned that "[t]he purpose of placing the cinnabar moth on the subject property was to attempt to control the tansy ragwort, and not to employ the land currently 'for the purpose of obtaining a profit in money.' " *Id.* at 126. The potential for *future* profitable activities was insufficient based on the statutory requirement for *current* use. *Id.*

for some other product or service do not qualify").)

There is no suggestion or evidence that Fazio Farms was a "hobby" farm or small family farm keeping a few animals for personal use. In that respect, it was clearly a *bona fide* farm operated with the primary purpose of obtaining a profit in money. Looking only at the landfill and remediation areas, Fazio's goal was to restore the land to future profitability from farming, though he received gross revenue from the landfill. Here, as with the "current employment" requirement, Fazio's profit purpose in the context of remediation must be viewed with a longer time span than the single tax year at issue. Taking that view, the court finds that the landfill and small remediation area were part of a *bona fide* farm property that Fazio operated with a primary purpose of making a profit in money.

4.      *Conclusion on landfill and small remediation area*

The court concludes that those parts of the subject properties used for the landfill and remediation qualify for farm use special assessment pursuant to ORS 308A.056(1)(h).

C.      *Corn Maze and Parking Lot*

Plaintiffs maintain that the corn maze and parking lot qualify for special assessment as "raising, harvesting, and selling crops" under ORS 308A.056(1)(a). Plaintiffs assert the primary purpose of the corn maze was "to develop organic matter for the soil, to help defray the cost of remediation, and to also market and sell [Fazio's] farm produce." (Ptfs' Cross MSJ at 9, *see id.* at 11 (describing corn maze as "instrumental in farm-direct marketing of Fazio's agribusiness"). Plaintiffs added that Fazio sold pumpkins, corn leaves for tamales, corn stalks for decoration, sunflowers, dill weed and, "importantly, the pickling cucumbers * * *." (*Id.* at 10-11.)

Defendant disagrees that the corn maze qualifies for special assessment under ORS 308A.056(1)(a) because its primary purpose was to make money from public entertainment, not

from raising, harvesting, or selling crops. (Def's Resp at 24-27; *see also* Def's Cross MSJ at 30-31 (*citing* OAR 150-308-1010(5)(c) ("Examples of non-farm use include * * * [l]and under areas used to encourage the use or enjoyment of agricultural products such as tasting rooms, banquet halls, public gathering areas, or public entertainment")).) Defendant argues that the corn maze does not qualify as "marketing" farm products because "several of the 'farm products' being marketed" do not come from the subject properties, "including the pickling cucumbers and some of the pumpkins." (Def's Resp at 24, n5, *citing* ORS 308A.056(1)(g) and *Jensen Family Joint Revocable Trust v. Marion County Assessor*, TC-MD 050902E, 2007 WL 283121 (Or Tax M Div, Jan 4, 2007).

It appears to the court that the primary purpose of the corn maze was to market or sell Fazio's farm products. The corn maze attracted customers to the subject properties where they could purchase farm products directly from Fazio Farms. Citing *Jensen*, Defendant maintains Fazio's sales of farm products grown on the Sauvie's Island parcel do not qualify. In *Jensen*, this court determined that land used for "marketing" qualifies for farm use special assessment "only if tied to the disposal of products raised on the property." *Jensen*, 2007 WL 283121 at *2.[14] The statute at issue in *Jensen*, ORS 308A.056(1)(g), refers to products raised on "land described in this section." So, the question becomes whether that reference to "land" is limited to a single property tax account or parcel, as Defendant argues, or refers to a larger "farm unit," as Plaintiff contends.

/ / /

---

[14] In *Jensen*, the court denied special assessment to 7.3 areas within an 80-acre parcel used "as the main farm operation and center for sales of nursery stock * * *." *Id.* at *1. The 7.3-acre area was a three-hole golf course that taxpayer used primarily as a "showroom" for nursery stock and grass. *Id.* The court held that merely displaying products without disposing of them did not qualify under ORS 308A.056(1)(g). *Id.* at *2.

The statute itself does not supply an answer, but a related statute concerning the income requirements for non-EFU land provides helpful context. ORS 308A.071 establishes income requirements based on the size of the "farm unit." A "farm unit" is "a farming enterprise which includes all parcels being farmed by a single operator, whether the operator owns or leases the farmland." OAR 150-308-1010(2)(a). A "farm unit" might contain multiple "farm parcels," which are "contiguous land under the same ownership." *See* ORS 308A.071(2)(c) (referencing "a farm parcel * * *operated as part of a farm unit"); ORS 308A.071(7)(a) (defining farm parcel). For instance, in *Simmons v. Polk County Assessor*, TC-MD 991355C, 2000 WL 33245423 at *1 (Or Tax M Div, Sep 29, 2000), the taxpayer owned 388 acres of land over numerous noncontiguous parcels, which taxpayer used to grow fruit trees, grass seed, and Christmas trees. The county had disqualified 15.87 acres for non-use. *Id.* The court held "that all of the land comprising the farm unit must be 'considered' in determining entitlement to special assessment." *Id.* at *2.

Based on the statutory context, the court concludes that the reference to "land" in ORS 308A.056(1)(g) refers to the "farm unit" rather than the "farm parcel." If a taxpayer may count the income from multiple farm parcels comprising a farm unit for purposes of the non-EFU income requirements, it makes sense that the qualifying activity of marketing products raised would also pertain to the farm unit rather than a farm parcel within it. Fazio operated the subject properties and the Sauvie's Island parcel under a single operation, Fazio Farms. So, Fazio's use of the corn maze and parking lot to market farm products available for purchase from Sauvie's Island qualifies for special assessment under ORS 308A.056(1)(g).

Defendant nevertheless argues that the primary use of the corn maze and parking lot was "entertainment," which is "non-farm use" under OAR 150-308-1010. (*See* Def's Cross MSJ at

30-31.) That rule lists several examples of "non-farm use that does not qualify for special assessment," including "[l]and under areas used to encourage the use or enjoyment of agricultural products such as tasting rooms, banquet halls, public gathering areas, or public entertainment." OAR 150-308-1010(5)(c). There is no evidence indicating that the corn maze or parking lot included a "tasting room, banquet hall," or similar type of structure dedicated to public gathering and entertainment. Moreover, another subsection of the rule indicates that farm stands offering agricultural products qualify as farm use. *See* OAR 150-308-1010(5)(a).[15] The court is satisfied that those parts of the subject properties used for a corn maze and parking are not excluded from special assessment by the definition of "non-farm use" in the rule.

The court concludes that the land used for a corn maze and related parking qualify for farm use special assessment under ORS 308A.056(1)(g) because they were used primarily to market for sale farm products from Fazio's farm unit, Fazio Farms.

D.    *Additional Tax Assessed Under ORS 308A.703, Plaintiffs' Appeal for 2023-24 Tax Year*

Having concluded that the entirety of the subject properties qualifies for farm use special assessment for the 2022-23 tax year, the court further concludes that additional taxes imposed under ORS 308A.703 must be removed. *See* ORS 308A.703(1) ("This section applies to land upon the land's disqualification from special assessment * * *.) It appears that Plaintiffs filed a complaint for the 2023-24 tax year primarily to protect their right to appeal the additional tax imposed under ORS 308A.703. Defendant asserted that Plaintiffs' appeal for the 2023-24 tax

---

[15] Another example of a non-farm use is "[l]and under retail stores, *except for farm stands offering agricultural products for sale* as described in ORS 215.213 and 215.283." (Emphasis added.) Whether the subject properties included a "farm stand" within the meaning of ORS 215.213 and 215.283 is beyond the scope of this decision. Neither party raised the issue nor presented evidence on it. The limited evidence presented indicates that Fazio's corn maze featured a "produce tent," from which farm products are sold, a "snack shack" that sells hot dogs, popcorn, candy, and other ready-to-eat snacks, and a "giant inflatable slide." (Def's Resp at 25-26.) Fazio's sale of agricultural products from a produce tent more closely resembles a farm stand than a tasting room or banquet hall.

year is moot if Plaintiffs prevail in their appeal for the 2022-23 tax year, because Defendant will correct the tax roll for the 2023-24 tax year based on reinstatement of special assessment. The court agrees that Plaintiffs' appeal for the 2023-24 tax year is now moot.

## IV. CONCLUSION

Upon careful consideration, the court concludes that the subject properties qualified for farm use special assessment for the 2022-23 tax year. Having granted Plaintiffs' appeal for the 2022-23 tax year, the court dismisses Plaintiffs' appeal for the 2023-24 tax year as moot. Now, therefore,

IT IS THE DECISION OF THIS COURT that, for the 2022-23 tax year, Plaintiffs' Cross Motion for Summary Judgment is granted, and Defendant's Cross Motion for Summary Judgment is denied. Properties identified as Accounts R238955 and R238956 qualify for farm use special assessment. Additional tax imposed under ORS 308A.703 must be removed.

IT IS FURTHER DECIDED that Plaintiffs' Complaint for the 2023-24 tax year is dismissed as moot.

ALLISON R. BOOMER
PRESIDING MAGISTRATE

*If you want to appeal this Decision, file a complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within <u>60</u> days after the date of this Decision or this Decision cannot be changed. TCR-MD 19 B.*

*This document was signed by Presiding Magistrate Allison R. Boomer and entered on January 10, 2025.*